**2020 IL 124289**


# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 124289)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
JONATHAN LINDSEY, Appellee.


*Opinion filed April 16, 2020.—Modified upon denial of rehearing September 28,
2020.*


JUSTICE THEIS delivered the judgment of the court, with opinion.

Justices Kilbride, Garman, and Karmeier concurred in the judgment and
opinion.

Chief Justice Anne M. Burke dissented, with opinion, joined by Justice Neville.

Chief Justice Anne M. Burke and Justice Neville dissented upon denial of
rehearing, without opinion.

Justice Michael J. Burke took no part in the decision.

**OPINION**

¶ 1    The central issue in this case is whether a warrantless dog sniff outside the door of the motel room where defendant Jonathan Lindsey was staying violated the fourth amendment. The Rock Island County circuit court decided that it did not and denied the defendant's motion to suppress evidence. The defendant was convicted of unlawful possession with intent to deliver a controlled substance within 1000 feet of a school (see 720 ILCS 570/407(b)(1) (West 2014)) and sentenced to seven years' imprisonment. The appellate court reversed and remanded, holding that the trial court should have granted the defendant's suppression motion. 2018 IL App (3d) 150877. For the reasons that follow, we reverse the judgment of the appellate court and affirm the judgment of the trial court.

¶ 2                                  BACKGROUND

¶ 3    Rock Island police officer Timothy Muehler received information from a confidential informant that the defendant was selling narcotics from a room at a local motel. A background check revealed that the defendant had an extensive criminal record, including two 2012 arrests for the manufacture and delivery of controlled substances. Another officer then contacted the defendant. The defendant stated that he had narcotics for sale and agreed to meet the officer. At the meeting, the officer and the defendant discussed drugs, but no deal occurred.

¶ 4    On April 27, 2014, Officer Muehler surveilled the motel and observed the defendant drive away from the parking lot. Muehler knew that the defendant had a suspended driver's license, so he followed the defendant's vehicle and called dispatch for help. Officer Jacob Waddle eventually stopped the defendant. He was arrested for driving with a suspended license (see 625 ILCS 5/6-303 (West 2014)) and transported to the Rock Island Police Department, where he signed a waiver of rights form. According to Officer Muehler, the defendant stated that he was staying in Room 129 at the motel. Another officer went there and spoke to the motel's staff, who advised that the defendant was staying in Room 130. Deputy Jason Pena of the Rock Island County Sheriff's Department and his K-9 partner Rio then went to the motel. Rio conducted a "free air sniff" outside Room 130 and alerted to the odor of narcotics. Officer Muehler submitted an affidavit outlining the investigation to a trial judge, who issued a search warrant. Inside the room, police found 4.7 grams

of heroin in a dresser drawer, along with related items—a digital scale, scissors, corner-cut plastic bags, and sandwich-sized plastic bags. The defendant later admitted that the heroin was his, and he was charged with unlawful possession with intent to deliver a controlled substance within 1000 feet of a school.

¶ 5        The defendant filed a motion to suppress evidence, arguing that the dog sniff violated the fourth amendment. The trial court held a hearing on the motion. The State called Sergeant Shawn Slavish of the Rock Island Police Department as its first witness. Sergeant Slavish testified that he participated in the investigation and learned the defendant was staying in Room 130 of the American Motor Inn. According to Slavish, the motel "is shaped in a U or a horseshoe shape with another building that sits at the entrance forming kind of a block there." The door to Room 130 is "set back in a little alcove[,] and as you stepped into the alcove to the right was Room 130." Slavish added that the alcove itself had a door, but the area was "open to the public, the door was propped open" on April 27.

¶ 6        Deputy Pena also testified the area was open to the public that day. There were no locked doors that prevented access to the door of Room 130. On the day of the dog sniff, Pena directed Rio to perform a free air sniff along the side of the motel. Once Rio reached "the general area" outside Room 130, he changed his behavior, sitting and lying down, which signaled an alert to the odor of narcotics. On cross-examination by defense counsel, Deputy Pena clarified that Rio "was approximately at the door handle and the door seam" and "within inches of the door" when he alerted. The State presented no further evidence.

¶ 7        The defendant called a single witness, Kylinn Ellis. Ellis testified that she was the mother of the defendant's son. On April 27, she "came down to see him" after work. At some point that afternoon, the defendant was driving Ellis's car with her in the passenger seat, when he was stopped by police and arrested. The car was impounded, and she walked back to the motel. As she approached the defendant's room, she noticed that "the curtains were moving, and you can like see somebody" inside the room. On cross-examination by the State, Ellis clarified that she did not see a person inside the room.

¶ 8        The trial court denied the defendant's motion. The trial court relied upon *United States v. Roby*, 122 F.3d 1120, 1125 (8th Cir. 1997), where a federal circuit court of appeals held that a hotel guest may have had a reasonable expectation of privacy

in his room but not in the corridor outside, so a warrantless dog sniff in that corridor did not violate the fourth amendment. The court concluded, "the motel room corridor is a public place of accommodation, and, as such, [police] have the right to walk that dog down there." Following a stipulated bench trial, the defendant was convicted and sentenced to seven years' imprisonment and three years' mandatory supervised release. He appealed.

¶ 9        A divided appellate court panel reversed and remanded. 2018 IL App (3d) 150877. The appellate court majority rejected *Roby* and relied instead upon *United States v. Whitaker*, 820 F.3d 849, 853-54 (7th Cir. 2016), where another federal circuit court of appeals held that an apartment resident may have had a reasonable expectation of privacy in the hallway outside his door, so a warrantless dog sniff in that hallway violated the fourth amendment. 2018 IL App (3d) 150877, ¶¶ 23-24. The majority explained that the defendant "had a justifiable expectation of privacy because, until Pena focused the free air sniff on the motel door and seams to detect the odor of drugs inside [his] motel room, the smell was undetectable outside of the room." *Id.* ¶ 24.

¶ 10       Having concluded that the warrantless dog sniff violated the fourth amendment, the appellate court majority shifted its attention to the exclusionary rule. The majority held that case law at the time was "quite sufficient to have apprised a reasonably well-trained officer that the execution of the Pena dog sniff without a warrant" was unconstitutional. *Id.* ¶ 36. The majority determined that the police lacked an objectively reasonable good-faith belief that their conduct was lawful, so the heroin ultimately recovered inside the defendant's room should have been suppressed. *Id.* ¶ 37.[1]

¶ 11       Justice Schmidt dissented. He observed that, while some courts have determined that dog sniffs of house and apartment doors constitute fourth amendment searches, those cases have not been extended to hotel room doors "because a hotel tenant possesses a reduced expectation of privacy." *Id.* ¶ 51 (Schmidt, J., concurring in part and dissenting in part) (citing, *inter alia*, *Roby*, 122 F.3d 1120). He added, "Even assuming that the majority correctly determined that

---

[1]The appellate court majority also vacated the drug assessment and street value fines and the DNA analysis fee levied against the defendant. 2018 IL App (3d) 150877, ¶¶ 41, 45. Those fines and fees are not at issue in this appeal.

the dog sniff in this case violated the fourth amendment (it did not), the good faith exception to the exclusionary rule applies." *Id.* ¶ 50.

¶ 12     This court allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. July 1, 2018).

¶ 13                                    ANALYSIS

¶ 14     Here, we must determine whether the appellate court erred in reversing the trial court's denial of the defendant's motion to suppress evidence. In reviewing a ruling on a suppression motion, we apply the familiar two-part standard of review announced by the United States Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996). See *People v. Luedemann*, 222 Ill. 2d 530, 542-43 (2006). Under that standard, we give deference to the factual findings of the trial court, and we will reject those findings only if they are against the manifest weight of the evidence. *Id.* We remain free, however, to decide the legal effect of those facts, and we review *de novo* the trial court's ultimate ruling on the motion. *Id.*

¶ 15     The fourth amendment to the United States Constitution provides:

        "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

The Illinois Constitution of 1970 provides:

        "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, § 6.

This court has long held that the search and seizure clause of our state constitution stands in "limited lockstep" with its federal counterpart. *People v. LeFlore*, 2015 IL 116799, ¶ 16.

¶ 16 Those guarantees offer protection to people, not places (*People v. Smith*, 152 Ill. 2d 229, 244 (1992) (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)), but the extent to which they protect people depends upon where the people are (*Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). Our analysis begins and ends, therefore, with the question of whether the defendant has established a legitimate expectation of privacy in the place searched. *People v. Johnson*, 237 Ill. 2d 81, 90 (2010). In doing so, the defendant must point to a source outside the constitution— namely, formal property interests or informal privacy interests. *United States v. Jones*, 565 U.S. 400, 408 (2012); *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978) ("Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.").

¶ 17 Those two types of sources roughly correspond to two complementary and overlapping tracks of fourth amendment jurisprudence: a property-based approach, exemplified by the United States Supreme Court's opinion in *Florida v. Jardines*, 569 U.S. 1 (2013), and a privacy-based approach, exemplified by Justice Kagan's concurrence in that case and Justice Harlan's concurrence in *Katz*. The government violates the fourth amendment either by a warrantless intrusion onto a person's property (see *id.* at 5) or by a warrantless infringement of a person's societally recognized privacy (see *id.* at 12 (Kagan, J., concurring, joined by Ginsburg and Sotomayor, JJ.) (citing *Katz*, 389 U.S. at 360 (Harlan, J., concurring))). As the Supreme Court has explained, property rights are the baseline to which *Katz* adds. *Id.* at 5 (majority opinion).

¶ 18 The parties focus almost solely on the privacy-based approach and only touch upon the property-based approach in the interest of "completeness." According to the State, the defendant "properly disclaimed" in the appellate court any argument that the unwarranted dog sniff violated the fourth amendment under *Jardines*. The defendant concedes that "property rights are not the sole measure of Fourth Amendment protections," so a property-based approach is "not necessary" to resolve this case. We disagree. If, as the State contends, the warrantless dog sniff

here did not violate the fourth amendment under the privacy-based approach, we still must determine whether it violated the fourth amendment under the property-based approach. Thus, we will address both approaches in turn.

¶ 19                                   Property-Based Approach

¶ 20        The property-based approach to the fourth amendment exclusively provided its protections for much of our history. *Id.*; see *Jones*, 565 U.S. at 405 ("The text of the Fourth Amendment reflects its close connection to property ***."). When the government obtains information by physically intruding on persons, houses, papers, or effects without a warrant, an unconstitutional search occurs. *Jardines*, 569 U.S. at 5 (citing *Jones*, 565 U.S. at 406 n.3).

¶ 21        In *Jardines*, the police received an unverified tip that the defendant was growing marijuana inside his home. A month later, a joint surveillance team of federal drug enforcement agents and local police officers descended on the house. After watching the house for 15 minutes, two officers and a drug-detection dog entered the defendant's yard and approached his porch. The dog sniffed the base of the defendant's front door and alerted to the odor of narcotics. One of the officers obtained a warrant and subsequently found marijuana plants inside the house. The defendant was charged with drug trafficking. Before trial, he filed a motion to suppress, arguing that the dog sniff was an unreasonable search. The trial court agreed, but the appellate court did not. The state supreme court affirmed the trial court's decision, and the State sought review from the United States Supreme Court.

¶ 22        The Court emphasized that "the home is first among equals" for fourth amendment purposes. *Id.* at 6. The amendment's core protection encompasses a person's right to escape inside the home and thereby to avoid unwanted government intrusion. *Id.* (citing *Silverman v. United States*, 365 U.S. 505, 511 (1961)). That right "would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity." *Id.* Thus, the area immediately surrounding and associated with the home—the so-called curtilage—remains constitutionally indistinct from it. *Id.* The Court described the front porch as "the classic exemplar" of the curtilage. *Id.* at 7. Because the officers had no

permission to plant themselves there in order to "engage in canine forensic investigation" (*id.* at 9), the dog sniff was indeed a search (*id.* at 11-12).

¶ 23     This court dissected *Jardines* in *People v. Burns*, 2016 IL 118973. In *Burns*, the Urbana Police Department received an anonymous tip that the defendant was selling marijuana. *Id.* ¶ 4. A detective conducted a background check of the defendant and learned that she had two prior arrests for marijuana possession. *Id.* ¶ 5. Several weeks later, the detective went to the defendant's apartment building to confirm her address. *Id.* ¶ 6. She lived in an apartment on the third floor of a multiunit building. The building had two locked entrances, so its common areas were not publicly accessible. *Id.* ¶ 3. The detective knocked on one entrance door, and another tenant admitted him into the building. *Id.* ¶ 6. Eventually, the detective was replaced by another police officer, who admitted a third officer and a drug-detection dog into the building. That officer and the dog went to the third floor. The defendant's apartment was located across a small landing from another apartment, and the dog alerted to the odor of narcotics outside her door. *Id.* ¶ 7. The detective then secured a warrant and found marijuana inside the apartment. *Id.* ¶¶ 8-9. She was charged with unlawful possession of cannabis with intent to deliver. The defendant filed a motion to suppress evidence, arguing that the dog sniff violated the fourth amendment under *Jardines*. The trial court granted that motion, and the State appealed. *Id.* ¶ 10. The appellate court affirmed the trial court's decision, holding that the warrantless dog sniff was unconstitutional, so the marijuana subsequently found in the defendant's apartment must be suppressed. *Id.* ¶ 13. The State appealed again.

¶ 24     This court affirmed the lower courts' decisions. *Id.* ¶ 81. We reviewed *Jardines* in great detail (*id.* ¶¶ 20-30), then considered, and summarily rejected, each of the State's arguments. First, the court disagreed with the State that the landing in front of the defendant's apartment did not qualify as curtilage under *Jardines* because the entrances were locked when the police attempted to enter the building and were "clearly not open to the general public." *Id.* ¶ 33. Second, the court disagreed with the State that the landing did not qualify as curtilage under the four-part test of *United States v. Dunn*, 480 U.S. 294, 301 (1987). *Burns*, 2016 IL 118973, ¶ 34. The court observed that the landing was in close proximity to the apartment; the landing and the apartment were both inside the building, whose entrances were locked; the landing was used only by the defendant and her nearest neighbor; and the landing

could not be seen by people outside. *Id.* ¶¶ 35, 37. Third, the court disagreed with the State that the boundaries of the landing were not easily determined: "The boundary to the landing of defendant's apartment is easily understood as curtilage" because it is "a clearly marked area within a locked building with limited use and restricted access." *Id.* ¶ 39. Fourth, the court disagreed with the State that the landing was not intimately associated with home activities, dismissing the State's final argument as a mere rehash of its unavailing *Dunn*-factors argument. *Id.* ¶ 40.

¶ 25　　　　The court again highlighted the fact that the entrances to the defendant's apartment building were locked when the police attempted to enter, knowing that the building was not publicly accessible. *Id.* ¶ 41. We noted, however, that "this case is distinguishable from situations that involve police conduct in common areas readily accessible to the public." *Id.* Under *Jardines*, "when police entered defendant's locked apartment building at 3:20 a.m. with a drug-detection dog, their investigation took place in a constitutionally protected area." *Id.* ¶ 44. Because the police did not have a warrant to conduct that search, it violated the fourth amendment. *Id.*

¶ 26　　　　More recently, this court stated that the distinction between locked and unlocked buildings emphasized in *Burns* "does not create a difference." *People v. Bonilla*, 2018 IL 122484, ¶ 25. The court held that a common area hallway of an apartment in an unlocked building is curtilage. *Id.* Consequently, a warrantless dog sniff at the defendant's apartment door in such a hallway violated the fourth amendment. *Id.* ¶ 32.

¶ 27　　　　*Burns* and *Bonilla* are simple and straightforward applications of *Jardines*. In all three cases, the dog sniffs occurred outside the doors of the defendants' homes. As *Jardines* makes abundantly clear through repetition of the term, "home" is the crux of the curtilage determination. If there is no home, there can be no "constitutionally protected extension" of it. *Jardines*, 569 U.S. at 8. As the defendant acknowledges, there are certain dwellings "where a traditional curtilage concept and analysis do not apparently or readily apply." We agree. The concept of curtilage may be incongruent with respect to a place of temporary lodging because

the area around that place is not physically and psychologically linked to it (*id.* at 7) and does not belong to the person staying there (*id.* at 5-6).[2]

¶ 28　　The record in this case does not show that Room 130 was the defendant's home. According to Officer Muehler's affidavit in support of a search warrant, a confidential informant warned that the defendant was "selling narcotics from the American Motor Inn." Muehler did not specify the date of the tip. The defendant stated that he was "staying" at the motel, and the motel's staff stated that he was "currently registered to room 130." Sergeant Slavish and Ellis both confirmed in their suppression hearing testimony that the defendant was "staying" at the motel, but neither revealed the length of his stay. If the defendant was only a guest at the motel for a day or a few days, it would be difficult to say that the room was his home and, consequently, difficult to say that the alcove was its curtilage. The defendant, who bore the burden of proof at the suppression hearing (see *People v. Brooks*, 2017 IL 121413, ¶ 22), offered no evidence in this regard. That alone is enough to decide the curtilage question against him and reject any property-based fourth amendment claim.

¶ 29　　Even if we assume that the defendant's motel room was his home, the alcove outside it was not curtilage under *Dunn*. Although the Supreme Court in *Jardines* did not cite *Dunn* or mention its four-factor test for determining whether the area searched is within the curtilage of a home, that test remains instructive. *Burns*, 2016 IL 118973, ¶ 87 (Garman, C.J., specially concurring). In *Dunn*, 480 U.S. at 301, the Court stated:

"[C]urtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. [Citations.] We do not suggest that combining these factors produces a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage

---

[2]We do not imply, however, that a hotel or motel room may never be a home or that the area outside such a room may never be within its curtilage. That is a case-by-case factual determination. As the defendant aptly notes, "a person residing in a motel long-term could indeed have curtilage depending on the facts of the case."

questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration— whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection."

See *People v. Pitman*, 211 Ill. 2d 502, 516 (2004) ("In determining whether a particular area falls within a home's curtilage, a court asks whether the area harbors the intimate activities commonly associated with the sanctity of a person's home and the privacies of life."). But see *State v. Williams*, 862 N.W.2d 831, 838 (N.D. 2015) (observing that the *Dunn* factors are "insufficient" to gauge whether a condominium building hallway is curtilage).

¶ 30　　　　Here, the alcove was in close proximity to Room 130 but also to Room 131. The alcove was not within an enclosed area surrounding the room. It had a door, which was closed in the pictures the defense counsel offered into evidence at the suppression hearing but propped open when Deputy Pena and Rio arrived at the motel. The alcove was not put to personal use by the defendant. He had no ownership or possession of the alcove, only a license to use it. The alcove offered a means of ingress and egress to the defendant and anyone visiting him, but also to a guest staying in Room 131 and that person's associates, as well as the motel's staff or service technicians charged with cleaning and maintaining both rooms. Indeed, it was accessible to the public at any time. Further, the defendant took no steps to shield it from observation by other motel guests or the public. Not only was the door to the alcove open on April 27, but the defendant disclaimed any connection to it when he misled police that he was staying in another room.

¶ 31　　　　Under *Dunn*, the alcove was not within the curtilage of his motel room. See *United States v. Legall*, 585 F. App'x 4, 5 (4th Cir. 2014) (*per curiam*) (applying the Dunn factors and concluding "the common hallway of the hotel was not within any curtilage of the hotel room"); *State v. Foncette*, 356 P.3d 328, 331 (Ariz. Ct. App. 2015) ("Although in close proximity to a private area, the public access hallway outside the door was not the type of area 'to which the activity of home life extends' so as to qualify as curtilage of the hotel room." (quoting *Oliver v. United States*, 466 U.S. 170, 182 n.12 (1984))). Consequently, the warrantless dog sniff in this case did not violate the fourth amendment under the property-based approach. We must determine next whether it violated the fourth amendment under the

privacy-based approach.[3]

¶ 32                          Privacy-Based Approach

¶ 33    The privacy-based approach to the fourth amendment has its roots in Justice
Harlan's short, but oft-referenced, concurrence in *Katz*, which "decoupled violation
of a person's Fourth Amendment rights from trespassory violation of his property."
*Kyllo v. United States*, 533 U.S. 27, 32 (2001). Justice Harlan summarized his
understanding of earlier cases: "[T]here is a twofold requirement, first that a person
have exhibited an actual (subjective) expectation of privacy and, second, that the
expectation be one that society is prepared to recognize as 'reasonable.' " *Katz*, 389
U.S. at 361 (Harlan, J., concurring); see *California v. Ciraolo*, 476 U.S. 207, 211-
12 (1986) (stating that *Katz* posits a two-part inquiry into whether a person has
"manifested a subjective expectation of privacy" in the object of the challenged
search and whether that expectation is reasonable in light of " 'the personal and
societal values protected by the Fourth Amendment' " (quoting *Oliver*, 466 U.S. at
182-83)). When the government, even in the absence of a physical intrusion into a
constitutionally protected area, obtains information by invading a reasonable
expectation of privacy in persons, houses, papers, or effects without a warrant, an
unconstitutional search occurs. *Kyllo*, 533 U.S. at 33; *Smith v. Maryland*, 442 U.S.
735, 740 (1979).

¶ 34    In *Jardines*, Justice Kagan joined the Court's opinion but took up the *Katz*
mantle in her concurrence, which Justices Ginsburg and Sotomayor joined. Justice
Kagan agreed with the Court that the police activity was a trespass on the
defendant's property, but she asserted that it was also an invasion of his privacy.
*Jardines*, 569 U.S. at 13 (Kagan, J., concurring, joined by Ginsburg and Sotomayor,
JJ.). While the Court considered the case under "a property rubric," Justice Kagan
"could just as happily have decided it" under a privacy one. *Id.* According to Justice
Kagan, "It is not surprising that in a case involving a search of a home, property

---

[3]Neither *Jardines* nor *Burns* offers guidance on that question. In *Jardines*, 569 U.S. at 11, the
Court felt that it "need not decide whether the officers' investigation of [the defendant's] home
violated his expectation of privacy under *Katz*" because the property-based approach "keeps easy
cases easy." And in *Burns*, 2016 IL 118973, ¶ 45, we observed that our "application of *Jardines*
makes it unnecessary to address the merits of whether use of the drug-detection dog violated
defendant's reasonable expectation of privacy."

concepts and privacy concepts should so align" because property law naturally influences shared social understandings "of what places should be free from governmental incursions." *Id.* (citing *Georgia v. Randolph*, 547 U.S. 103, 111 (2006)). The defendant's home was his property, as well as his most intimate and familiar space, so a property analysis and a privacy analysis would run on similar paths. *Id.* at 14.

¶ 35 Justice Kagan felt that the case could have been resolved on privacy grounds alone after *Kyllo*. *Id.* In *Kyllo*, the Court held that police conducted a search when they directed a thermal sensor to detect heat emanating from the defendant's home, even though they committed no trespass. *Kyllo*, 533 U.S. at 40. To Justice Kagan, that firm and bright rule governed *Jardines*. The dog in *Jardines*, like the sensor in *Kyllo*, was " 'a device that is not in general public use' " employed " 'to explore details of the home that would previously have been unknowable without physical intrusion.' " *Jardines*, 569 U.S. at 14 (Kagan, J., concurring, joined by Ginsburg and Sotomayor, JJ.) (quoting *Kyllo*, 533 U.S. at 40). Both the sensor and the dog effected searches for which a warrant was required. *Id.* at 14-15.

¶ 36 Justice Kagan's concurrence was the primary support for the Seventh Circuit's decision in *Whitaker*, upon which the appellate court majority below heavily relied. In *Whitaker*, the police received information from a confidential informant that a person was dealing drugs at an apartment. *Whitaker*, 820 F.3d at 851. The property manager of the apartment building signed a consent form authorizing police to conduct a dog sniff of the building. A police officer and his dog proceeded to the building, where the dog alerted to the presence of drugs at the door to the defendant's apartment. A subsequent search of the apartment pursuant to a warrant revealed marijuana, cocaine, and heroin. *Id.* The defendant was charged with possession with intent to deliver. *Id.* The defendant filed a motion to suppress, which the trial court denied. He was convicted and sentenced. *Id.* at 851-52. He appealed, insisting that the warrantless dog sniff violated the fourth amendment under *Jardines* and *Kyllo*. *Id.* at 852.

¶ 37 The federal court of appeals reversed and remanded. *Id.* at 855. The appeals court analyzed the case under the privacy rubric, holding that "[t]he use of a drug-sniffing dog *** clearly invaded reasonable privacy expectations, as explained in Justice Kagan's concurring opinion in *Jardines*." *Id.* at 852. A dog sniff in an

apartment hallway comes within the rule in *Kyllo* because a dog is a "sophisticated sensing device not available to the general public" and because it detected something—the presence of drugs—that would have been unknowable without entering the apartment. *Id.* at 853.[4] Although the defendant did not have "a reasonable expectation of complete privacy in his apartment hallway," that did not mean he had "no reasonable expectation of privacy against persons in the hallway snooping into his apartment using sensitive devices not available to the general public." *Id.* The appeals court added that the defendant did not have the right to exclude other people from the hallway, but he did have the right to expect certain norms of behavior there: "Yes, other residents and their guests (and even their dogs) can pass through the hallway. They are not entitled, though, to set up chairs and have a party in the hallway right outside the door." *Id.*

¶ 38    The defendant contends that *Kyllo* and *Whitaker* dictate the result here. According to the defendant, those cases intimate that he had a reasonable expectation of privacy inside his motel room, so that the warrantless dog sniff was a search in violation of the fourth amendment. Certainly, the defendant is correct in asserting that hotel or motel guests have a reasonable expectation of privacy inside their rooms. See *Stoner v. California*, 376 U.S. 483, 490 (1964) ("[n]o less than a tenant of a house, or the occupant of a room in a boarding house [citation], a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures"); *Hoffa v. United States*, 385 U.S. 293, 301 (1966) ("[a] hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office"); accord *People v. Bankhead*, 27 Ill. 2d 18, 23 (1963). But see *United States v. Agapito*, 620 F.2d 324, 331 (2d Cir. 1980) ("the reasonable privacy expectations in a hotel room differ from those in a residence").

¶ 39    The only expectation of privacy that matters, however, is the expectation related to the place searched. Contrary to the appellate court majority's suggestion below,

---

[4]Notably, the appeals court distinguished *United States v. Place*, 462 U.S. 696 (1983), where the Supreme Court upheld a dog sniff of luggage at an airport, and *Illinois v. Caballes*, 543 U.S. 405 (2005), where the Court upheld a dog sniff of a vehicle during a traffic stop, because "[n]either case implicated the Fourth Amendment's core concern of protecting the privacy of the home." *Whitaker*, 820 F.3d at 853. The *Jardines* Court similarly limited *Place* and *Caballes* to their factual settings by stating that those cases held "canine inspection of luggage in an airport" and "canine inspection of an automobile during a lawful traffic stop" did not violate the defendants' reasonable expectation of privacy under *Katz. Jardines*, 569 U.S. at 10.

Rio's free air sniff did not detect the odor of narcotics inside Room 130 (see 2018 IL App (3d) 150877, ¶ 24) but rather outside. That is, Rio did not teleport through the door and smell the air in the room; Rio smelled the air in the alcove. See *Sanders v. Commonwealth*, 772 S.E.2d 15, 25 (Va. Ct. App. 2015) ("a dog does not detect anything inside a [motel room], but merely detects the particulate odors that have escaped from a [motel room]," so "the odors are no longer private, but instead are intermingled with the public airspace" (internal quotation marks omitted)); *cf. United States v. Morales-Zamora*, 914 F.2d 200, 205 (10th Cir. 1990) ("we find that when the odor of narcotics escapes from the interior of a vehicle, society does not recognize a reasonable privacy interest in the public airspace containing the incriminating odor"); see generally, *Illinois v. Caballes*, 543 U.S. 405, 409 (2005) ("the dog sniff was performed on the exterior of respondent's car"); *United States v. Place*, 462 U.S. 696, 707 (1983) (remarking that the dog sniff was performed on "respondent's luggage, which was located in a public place," and not its contents). The question becomes whether the defendant had an expectation of privacy there.

¶ 40 In determining whether a person has a reasonable expectation of privacy in a place searched, we consider the person's ownership or possessory interest in the place, the person's prior use of the place, the person's exclusive control of the place or ability to exclude others from it, and the person's subjective expectation of privacy in the place. *Johnson*, 237 Ill. 2d at 90 (citing *People v. Sutherland*, 223 Ill. 2d 187, 230 (2006)). That determination is fact-specific. See *People v. Gill*, 2018 IL App (3d) 150594, ¶ 96 ("[t]he question of whether a defendant has a reasonable expectation of privacy depends on the totality of the circumstances," which "will vary from person to person and case to case").

¶ 41 Here, the defendant had no reasonable expectation of privacy in the alcove outside his room. He did not own the alcove. See *Esser v. McIntyre*, 267 Ill. App. 3d 611, 618 (1994) ("the hotel, not the guest, is the possessor of the real property to which the guest and his guests have access"); *Sanders*, 772 S.E.2d at 24 (stating that the defendant had a possessory interest in a motel room, "but as to the walkways, his interest, like that of the other motel guests, was one of common, not exclusive, use and access"). Consequently, he could not control who entered the alcove or exclude people from it. The defendant was staying in Room 130, so he presumably used the alcove for ingress and egress, but there is no evidence that he used it in any other way.

¶ 42    Finally, there is no evidence that he had a subjective expectation of privacy in the alcove. A guest's expectation of privacy inside a motel room diminishes quickly outside it. See *People v. Eichelberger*, 91 Ill. 2d 359, 366 (1982) ("[I]n contrast to the occupant of a private dwelling who has the exclusive enjoyment of the land he possesses immediately surrounding his home, the hotel occupant's reasonable expectations of privacy are reduced with regard to the area immediately adjoining his room."); see also *Roby*, 122 F.3d at 1125 (holding that a hotel guest had an expectation of privacy in his room but that the expectation did not extend to the corridor outside his room); *United States v. Dockery*, 738 F. App'x 762, 764 (3d Cir. 2018) (holding that the defendant did not have a "reasonable expectation of privacy in [the] common area of the motel, which was open to guests and the public alike"); *United States v. Jackson*, 588 F.2d 1046, 1052 (5th Cir. 1979) (stating that a motel guest's fourth amendment rights do not evaporate, but "the extent of the privacy he is entitled to reasonably expect may very well diminish" because "a transient occupant of a motel must share corridors, sidewalks, yards, and trees with the other occupants"); *United States v. Marlar*, 828 F. Supp. 415, 419 (N.D. Miss. 1993) (holding that a dog sniff of an exterior motel room door did not intrude upon the defendant's reasonable expectation of privacy); *Sanders*, 772 S.E.2d at 24 (holding that the defendant had a reasonable expectation of privacy inside his room but "no expectation of privacy in the sights, sounds, and smells detectible without unconstitutional intrusion from outside" the room). The defendant undoubtedly wanted his illegal activity to remain private. "The test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity" but "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Oliver*, 466 U.S. at 182-83. When the defendant's expectation was but a sliver of hope that the odor of narcotics would not be sensed by a drug-detection dog in the alcove outside his motel room, that expectation is not reasonable and not subject to fourth amendment protection.

¶ 43                                          CONCLUSION

¶ 44    For the reasons that we have stated, the judgment of the appellate court is reversed, and the judgment of the circuit court is affirmed. The reversal of the appellate court is without prejudice as to defendant filing a motion in the circuit court for correction of fines and fees under Illinois Supreme Court Rule 472 (eff.

May 17, 2019).

¶ 45 Appellate court judgment reversed.

¶ 46 Circuit court judgment affirmed.

¶ 47 CHIEF JUSTICE ANNE M. BURKE, dissenting:

¶ 48 The majority holds that a police officer's use of a trained drug-detection dog to sniff at the door of defendant's motel room did not constitute a search of the room within the meaning of the fourth amendment. *Supra* ¶ 39. Instead, it holds that the dog sniff was merely a search of the alcove outside the room. *Supra* ¶¶ 40-42. This holding cannot be reconciled with the clear precedent of the United States Supreme Court. I therefore respectfully dissent.

¶ 49 ANALYSIS

¶ 50 Police in Rock Island, Illinois, used a trained drug-detection dog to conduct a sniff at defendant's motel room door. The dog alerted to the presence of drugs inside the room, and based on that alert, police obtained a search warrant. Heroin was discovered inside the motel room, and defendant was thereafter convicted of unlawful possession with intent to deliver a controlled substance. Before this court, defendant contends that the dog sniff was an unreasonable search of his motel room in violation of the fourth amendment.

¶ 51 The fourth amendment, which applies to the states through incorporation by the fourteenth amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. A search occurs within the meaning of the fourth amendment "when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Determining whether a reasonable expectation of privacy exists is a two-part inquiry. *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). First, the person must have exhibited a subjective expectation of privacy in the

place searched. Second, the expectation must be one that society is prepared to recognize as reasonable. *Id.*

¶ 52 In this case, the majority concedes that defendant had a reasonable expectation of privacy inside his motel room. *Supra* ¶ 38. However, the majority concludes this fact is of no moment. The majority explains that the only expectation of privacy that matters "is the expectation related to the place searched." *Supra* ¶ 39. The majority then states that the dog in this case "did not teleport through the door and smell the air in the room; [it] smelled the air in the alcove." *Supra* ¶ 39. From this, the majority concludes that the police did not conduct a search of the interior of defendant's motel room at all but, instead, searched only the alcove outside the room. *Supra* ¶ 39. I disagree. The majority holds that the dog sniff would only have been a search of defendant's motel room if the dog had been on the other side of the door. In other words, according to the majority, a search does not occur under the fourth amendment unless a government agent or monitoring device gathering information physically intrudes into a space in which a person has a reasonable expectation of privacy. This reasoning is directly contrary to United States Supreme Court precedent.

¶ 53 The Supreme Court has repeatedly held that a government agent's use of a monitoring device to obtain information about the interior of an enclosed space in which a person has a reasonable expectation of privacy constitutes a search under the fourth amendment—even if the monitoring device collecting the information is itself located outside the enclosed space. The Court has applied this rule to (1) an eavesdropping device attached to the outside of a public telephone booth (*Katz*, 389 U.S. at 353), (2) a tracking device collecting information from a "beeper" attached to a can of chemicals inside a house (*United States v. Karo*, 468 U.S. 705, 714-16 (1984)), (3) a thermal imaging device used to measure the amount of heat emanating from a house (*Kyllo v. United States*, 533 U.S. 27, 34-35 (2001)), and, of particular relevance here, (4) a drug-detection dog sniff on the front porch of a house (*Florida v. Jardines*, 569 U.S. 1 (2013)).

¶ 54 Underlying each of these decisions is the fundamental principle that "the Fourth Amendment protects people, not places." *Katz*, 389 U.S. at 351. That is, the fourth amendment protects a person's right to a reasonable expectation of privacy, not just the right to be free from unreasonable physical intrusion. Thus, the collection of

information by the government can amount to a search under the fourth amendment even where the government does not physically intrude into the place being searched. *Id.* at 353.

¶ 55  For instance, in *Karo*, government agents used a tracking device to monitor a beeper signal emanating from a house from a separate location. *Karo*, 468 U.S. at 714. Neither the agents nor the tracking device ever crossed the threshold of the curtilage surrounding the home. Nevertheless, the Supreme Court held that the monitoring of the beeper was a violation of the defendant's reasonable expectation of privacy and, thus, constituted a search of the house, because it "reveal[ed] a critical fact about the interior of the premises that the Government [wa]s extremely interested in knowing and that it could not have otherwise obtained without a warrant." *Id.* at 715.

¶ 56  Similarly, in *Kyllo*, a thermal imaging device was placed inside a vehicle parked across the street from the home that the government agents were monitoring. *Kyllo*, 533 U.S. at 30. The government argued that the thermal imaging was permissible under the fourth amendment because it detected only heat radiating from the external surface of the house. *Id.* at 35. The Court rejected this argument, finding that the thermal imager infringed upon a reasonable expectation of privacy by detecting information about the inside of the home that could not otherwise have been obtained without entering inside. *Id.* at 40. The Court explained:

> "just as a thermal imager captures only heat emanating from a house, so also a powerful directional microphone picks up only sound emanating from a house—and a satellite capable of scanning from many miles away would pick up only visible light emanating from a house. We rejected such a mechanical interpretation of the Fourth Amendment in *Katz*, where the eavesdropping device picked up only sound waves that reached the exterior of the phone booth. Reversing that approach would leave the homeowner at the mercy of advancing technology—including imaging technology that could discern all human activity in the home. While the technology used in the present case was relatively crude, the rule we adopt must take account of more sophisticated systems that are already in use or in development." *Id.* at 35-36.

¶ 57  The Supreme Court has also applied these principles to dog sniffs. In *Jardines*, police used a drug-detection dog to conduct a sniff on the front porch of the house

in which the defendant resided. *Jardines*, 569 U.S. at 4. Although the majority opinion and the concurrence in that case relied on different rationales,[5] the five justices in the majority agreed that the dog sniff gathered information about the *inside* of the house, not information about the porch on which the dog sniff took place. *Id.* at 3, 5 (finding the officers used the dog sniff to investigate the contents of the home); *id.* at 12 (Kagan, J., concurring, joined by Ginsburg and Sotomayor, JJ.) (concluding that the purpose of the dog sniff was to detect things inside the home that the officers could not perceive unassisted). Indeed, no justice held, or even suggested, that the dog sniff was not a search of the house's interior because the dog had only smelled the air on the porch. See also, *e.g.*, *Florida v. Harris*, 568 U.S. 237, 248 (2013) (the sole purpose of a dog sniff is to gather information about the contents of a private enclosed space); *United States v. Whitaker*, 820 F.3d 849, 853 (7th Cir. 2016) (same); *United States v. Thomas*, 757 F.2d 1359, 1366-67 (2d Cir. 1985) (same).

¶ 58        To be sure, the government's gathering of information about the interior of an enclosed space may not amount to a search if that information is in plain view or "plain smell." However, a drug-detection dog is only necessary in those situations where nothing is in "plain smell." A trained police dog is as much a sophisticated monitoring "device" as was the eavesdropping device in *Katz*, the tracking device in *Karo*, or the thermal imager in *Kyllo*. As Justice Kagan explained in *Jardines*, "drug-detection dogs are highly trained tools of law enforcement, geared to respond in distinctive ways to specific scents so as to convey clear and reliable information to their human partners. [Citation.] They are to the poodle down the street as high-powered binoculars are to a piece of plain glass." *Jardines*, 569 U.S. at 12-13 (Kagan, J., concurring, joined by Ginsburg and Sotomayor, JJ.). Just as the police are not entitled to stand on a person's front porch and peer inside the window with

---

[5]The majority opinion in *Jardines*, authored by Justice Scalia, held that the dog sniff constituted a search because the police officers physically entered and occupied the house's curtilage, which enjoys protection as part of the home itself, in order to engage in conduct not explicitly or implicitly permitted by the defendant. *Jardines*, 569 U.S. at 5-6. The concurring justices joined in this reasoning but argued that the dog sniff was a search for the additional reason that it violated the defendant's reasonable expectation of privacy in the home. *Id.* at 12 (Kagan, J., concurring, joined by Ginsburg and Sotomayor, JJ.).

high-powered binoculars, they also are not entitled to bring a drug-sniffing dog to a house in order to detect objects "not in plain view (or plain smell)." *Id.* at 13.

¶ 59    The United States Court of Appeals for the Seventh Circuit applied the foregoing decisions to a dog sniff at the door of an apartment in *Whitaker*, 820 F.3d at 853. In that case, the Seventh Circuit stated "[t]here is little doubt that a highly trained drug-detecting dog is a 'super-sensitive instrument' under *Kyllo*." *Id.* at 853 n.1 (citing *Jardines*, 569 U.S. at 13 (Kagan, J., concurring, joined by Ginsburg and Sotomayor, JJ.)). The court then held that the dog sniff violated the defendant's reasonable expectation of privacy "against persons in the hallway snooping *into his apartment* using sensitive devices not available to the general public." (Emphasis added.) *Id.* at 853. For the same reason that a police officer may not put a stethoscope to an apartment door and listen to the conversation inside, the court reasoned, an officer is not entitled to "park a sophisticated drug-sniffing dog outside an apartment door, at least without a warrant." *Id.* at 853-54.

¶ 60    Supreme Court precedent leaves no question that a government agent's use of a sophisticated monitoring device to obtain information about the interior of an enclosed space in which a person has a reasonable expectation of privacy constitutes a search under the fourth amendment. And this remains true even if the monitoring device collecting the information is itself located outside the enclosed space. In this case, it is clear the dog sniff collected information about the interior of defendant's motel room, an area in which defendant had a reasonable expectation of privacy. Deputy Jason Pena testified that he and his K-9 partner were asked to perform a "free air sniff" of room 130 of the motel. He testified that the dog alerted to the odor of narcotics at the door to room 130 by lying down in front of the door. According to Deputy Pena's testimony, the dog was positioned "at the door handle and the door seam" when he alerted. He testified that the dog "got within inches of the door" to room 130.

¶ 61    Following the positive alert, the police department applied for a search warrant in the circuit court. The complaint for search warrant alleged that police had probable and reasonable grounds to believe that defendant was in possession of controlled substances and/or other illicit items at his

"residence on the premises located at 4300-11th St. room #130 Rock Island, Rock Island County, Illinois being a tan with blue trim, single story, multi-unit

hotel complex with room #130 being a single unit of the multi-unit complex known as American Motor Inn with the numbers '130' affixed to the west side of the south-facing door."

An affidavit attached to the complaint alleged, in part, that "Rock Island County Deputy Pena and his K-9 partner conducted a free air sniff of 4300-11th St. room #130 with a positive alert." According to the affidavit, defendant subsequently admitted to police that he was currently staying in room 130 at the American Motor Inn. The court signed the search warrant. Police then searched the interior of room 130, where they found a quantity of what was later determined to be heroin, along with United States currency and alleged drug paraphernalia. Based on the discovery of these items, defendant was charged with unlawful possession with intent to deliver a controlled substance and was later convicted of that charge at a bench trial.

¶ 62    The police in this case used a monitoring "device" not in general public use, a trained police drug-detection dog, to obtain information that defendant was possessing illegal drugs inside his motel room. The purpose of the dog sniff was to provide information about what was inside the room, not what was in the alcove. We know this because the police were directed to obtain a free air sniff of Room 130, not the alcove outside Room 130. Moreover, the police used the evidence of the dog's positive response to establish probable cause for a warrant to search the inside of the motel room. They did not seek a search warrant for the alcove but for the room. If the dog was merely detecting odors in the alcove, as the majority concludes, then it was not possible that the canine alert established sufficient evidence to secure a warrant to search the room. The majority fails to explain this discrepancy. Without question, the dog sniff collected information about the interior of defendant's motel room, a space in which the majority concedes defendant had a reasonable expectation of privacy. The dog sniff was therefore a search of the room.

¶ 63    The majority makes no attempt to explain why the Supreme Court's decisions in *Katz*, *Karo*, *Kyllo*, and *Jardines* have no application here. Nor does the majority make any attempt to explain why the Seventh Circuit's decision in *Whitaker* is unpersuasive. Instead, the majority relies almost entirely on an opinion by the intermediate Virginia Court of Appeals, *Sanders v. Commonwealth*, 772 S.E.2d 15 (Va. Ct. App. 2015). *Supra* ¶ 39. Like the majority here, the court in that case held

that a dog sniff at a motel room door did not detect anything inside the room but merely detected the odor particles that escaped from the room and that, thus, no search occurred. *Sanders*, 772 S.E.2d at 25. This analysis is deeply flawed.

¶ 64 Just as the uses of the eavesdropping device in *Katz*, the tracking device in *Karo*, the thermal imager in *Kyllo*, and the dog sniff in *Jardines* all constituted searches under the fourth amendment because they gathered formation from an area in which a person had a reasonable expectation of privacy, so too did the warrantless dog sniff in this case. The conclusion by *Sanders* and the majority, that a dog sniff at a motel room door gathers no information about the room's interior and therefore is not a search of the room itself, is simply wrong.

¶ 65 In support of its conclusion that the dog sniff was not a search of defendant's motel room, the majority also cites cases addressing the dog sniff of a vehicle during a lawful traffic stop or a sniff of luggage at an airport. *Supra* ¶ 39 (citing *Illinois v. Caballes*, 543 U.S. 405 (2005), *United States v. Place*, 462 U.S. 696 (1983), and *United States v. Morales-Zamora*, 914 F.2d 200 (10th Cir. 1990)). However, the majority mischaracterizes these cases as finding that the dog sniffs gathered information only about the exterior of the vehicle or luggage. This is incorrect. The entire point of the dog sniff is to gather information about the interior of an enclosed space. See *Caballes*, 543 U.S. at 410 (holding the dog sniff was conducted to detect and locate contraband *inside* the car); *Place*, 462 U.S. at 707 (holding the dog sniff revealed information about the luggage's contents, *i.e.*, whether contraband was present *inside* the luggage).

¶ 66 I would find that the free-air dog sniff in this case constituted a warrantless search of the motel room in violation of defendant's fourth amendment rights. Without the evidence of the positive dog sniff alert, there was insufficient evidence in the complaint and affidavit for a search warrant to support a finding of probable cause. The exclusionary rule prohibits the introduction into evidence of the products of unreasonable searches and seizures. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). Therefore, the evidence resulting from the search of defendant's motel room should have been suppressed as fruit of the poisonous tree. See *People v. Henderson*, 2013 IL 114040, ¶ 33.

¶ 67 Finally, I express no opinion on that part of the majority opinion holding that no search occurred under the property-based approach. *Supra* ¶¶ 19-31. This

analysis is unnecessary to determine that a fourth amendment search occurred in this case.

¶ 68    For the foregoing reasons, I respectfully dissent.

¶ 69    JUSTICE NEVILLE joins in this dissent.


¶ 70    JUSTICE MICHAEL J. BURKE took no part in the consideration or decision of this case.