In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 14-3290 and 14-3506

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LONNIE WHITAKER,

*Defendant-Appellant.*

Appeals from the United States District Court for the
Western District of Wisconsin.
Nos. 14-cr-00017, 07-cr-00123 — **Barbara B. Crabb**, *Judge.*

ARGUED APRIL 20, 2015 — DECIDED APRIL 12, 2016

Before WOOD, *Chief Judge*, HAMILTON, *Circuit Judge*, and
DARRAH, *District Judge.**

DARRAH, *District Judge.* Acting on information that drugs
were being sold from a certain apartment in Madison, Wis-
consin, law enforcement obtained the permission of the
apartment property manager and brought a narcotics-

---

*Hon. John W. Darrah of the Northern District of Illinois, sitting by
designation.

detecting dog to the locked, shared hallway of the apartment building.  The dog alerted to the presence of drugs at a nearby apartment door and then went to the targeted apartment where Whitaker was residing.  After the officers obtained a search warrant, Whitaker was arrested and charged with drug and firearm crimes based on evidence found in the apartment. At the time of his arrest, Whitaker was serving a term of supervised release in Case No. 07-cr-123, a conviction for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). After the district court denied his pretrial motions challenging the search and the dog's reliability, Whitaker entered a conditional guilty plea that preserved his right to appeal the district court's ruling.

On appeal, Whitaker raises four issues.  First, he argues the use of the dog was a search under the Fourth Amendment and *Florida v. Jardines*, 133 S. Ct. 1409 (2013).  Second, he contends that the district court should have granted him a *Franks* hearing because there was a material omission in the affidavit used to obtain the search warrant.  Third, Whitaker claims that the dog's training records should have been turned over to him, pursuant to *Florida v. Harris*, 133 S. Ct. 1050 (2013).  Finally, he argues his term of supervised release had expired and he should not have been sentenced after revocation.  For the reasons discussed below, we reverse the district court's holding regarding the search. The remaining issues are therefore moot.

## I. BACKGROUND

In October 2013, Dane County Sheriff's Deputy Joel Wagner met with a confidential informant about drug dealing at 6902 Stockbridge Drive, Apartment 204, in Madison, Wisconsin.  The informant told Wagner that "Javari" lived in

Apartment 204, drove a black Cadillac Escalade and carried a handgun in his waistband. The informant reported seeing Javari and another individual selling drugs in the apartment.

On October 14, 2013, Wagner met with the property manager for 6902 Stockbridge Drive and learned that Apartment 204 was leased to Ruthie Whitaker. The property manager took Wagner to the underground parking garage, where Wagner observed a black Cadillac Escalade in the parking stall for Apartment 204. The license plate showed that the Escalade was registered to Ruthie Whitaker.

Over a month later, on November 25, 2013, the same informant sent Wagner a text message. The text message indicated that one of the individuals dealing drugs contacted the informant and told the informant that the individual was back in town and was at the apartment with a lot of "h." The informant knew "h" to mean heroin. On December 4, 2013, the property manager signed a consent form, authorizing a K9 search of 6902 Stockbridge Drive. On December 17, 2013, Wagner received an anonymous complaint concerning drug activity at 6902 Stockbridge Drive. The anonymous informant did not specifically mention Apartment 204 but indicated that the person who was selling out of 6902 Stockbridge Drive drove a black Cadillac Escalade.

On January 7, 2014, Wagner and Deputy Jay O'Neil, with his drug-sniffing K9 partner, "Hunter," went to 6902 Stockbridge Drive. Hunter first alerted on the Escalade parked in the space for Apartment 204. Upon a later search of the Escalade, no drugs were found.

The officers took Hunter to the second floor of the apartment building and into its locked hallway, where there

were at least six to eight apartments. According to his police report (produced during discovery), O'Neil took Hunter on a quick walk through the hallway in order to get used to any people or animal smells. During the first pass, Hunter showed extreme interest in Apartment 204 but did not alert. Hunter then alerted to the presence of drugs at the door of nearby Apartment 208. Wagner told O'Neil that it was not the targeted apartment. On a secondary sniff, Hunter alerted on Apartment 204.

After obtaining the search warrant, the officers recovered cocaine, heroin, and marijuana in Apartment 204. Whitaker was the sole occupant at the time the warrant was executed, and, in a post-arrest interview, he admitted he lived there. He also told officers about a handgun in his apartment and consented to the officers' re-entry to retrieve it.

On April 11, 2014, Whitaker filed a motion to suppress the evidence seized during the search. He also requested a *Franks* hearing and the production of Hunter's training records. On May 19, 2014, the magistrate judge issued a Report and Recommendation, recommending that Whitaker's motions be denied. On June 16, 2014, the district court adopted the Report and Recommendation. On October 9, 2014, Whitaker was sentenced to consecutive terms of 12 months' imprisonment on Count 1, possession with intent to distribute heroin and cocaine, and 60 months' imprisonment on Count 3, use of a firearm in furtherance of a drug trafficking crime. On November 14, 2014, the district court revoked Whitaker's supervised release in Case No. 07-cr-123 and sentenced him to a term of 18 months' imprisonment to run consecutively with the sentence given for Count 3 and concurrently with the sentence given for Count 1.

## II. ANALYSIS

### A.  The Fourth Amendment and <u>Jardines</u>

When reviewing appeals from denials of motions to suppress, we review legal questions *de novo* and factual findings for clear error.  *United States v. Breland*, 356 F.3d 787, 791 (7th Cir. 2004).  Whitaker contends that the district court erred in holding that he had no expectation of privacy in the apartment building's common hallway and denying his motion to suppress the evidence gathered from his apartment.

In *Florida v. Jardines*, 133 S. Ct. 1409, 1417-18 (2013), the Supreme Court held that the government's use of a trained police dog to investigate a home and its immediate surroundings was a search under the Fourth Amendment.  The Court explained that the defendant had an expectation of privacy in his porch, which is part of the home's curtilage and "enjoys protection as part of the home itself."  *Id.* at 1414.  This is because the curtilage "is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened.'"  *Id.* at 1415 (quoting *California v. Ciraolo*, 476 U.S. 207, 213). The Court was clear that its holding was based on the trespass to the defendant's curtilage, not a violation of the defendant's privacy interests.  *Id.* at 1417-20.  Therefore, when the police physically intruded onto the defendant's property to gather evidence without a warrant or consent, they had conducted a search without a license to do so, in violation of the Fourth Amendment.  *Id.* at 1417.

Whitaker argues that *Jardines* should be extended to the hallway outside his apartment door because the law enforcement took the dog to his door for the purpose of gather-

ing incriminating forensic evidence. He cites to *United States v. Herman*, 588 F. App'x 493, 494 (7th Cir. 2014), in which we specifically left open the question of whether "*Jardines* applies to apartment hallways (which are open to many persons other than a given tenant's family and invitees), whether consent of another tenant or the landlord would permit a dog to enter, and whether, if the use of the dog is a search, what is required for that search to be reasonable (reasonable suspicion? probable cause? probable cause plus a warrant?)." Although Whitaker recognizes that *Jardines* was premised on trespass to property, he also argues that this use of a drug-detection dog violated his privacy interests under *Kyllo v. United States*, 533 U.S. 27 (2001), and *Katz v. United States*, 389 U.S. 347 (1967).

The use of a drug-sniffing dog here clearly invaded reasonable privacy expectations, as explained in Justice Kagan's concurring opinion in *Jardines.* The police in *Jardines* could reasonably and lawfully walk up to the front door of the house in that case to knock on the door and ask to speak to the residents. The police were not entitled, however, to bring a "super-sensitive instrument" to detect objects and activities that they could not perceive without its help. 133 S. Ct. at 1418. The police could not stand on the front porch and look inside with binoculars or put a stethoscope to the door to listen. Similarly, they could not bring the super-sensitive dog to detect objects or activities inside the home. As Justice Kagan explained, viewed through a privacy lens, *Jardines* was controlled by *Kyllo*, which held that police officers conducted a search by using a thermal-imaging device to detect heat emanating from within the home, even without trespassing on the property. 133 S. Ct. at 1419.

*Kyllo* held that where "the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." 533 U.S. at 40. That rule reflects a concern with leaving "the homeowner at the mercy of ... technology that could discern all human activity in the home." *Id.* at 35-36. A dog search conducted from an apartment hallway comes within this rule's ambit. A trained drug-sniffing dog is a sophisticated sensing device not available to the general public. The dog here detected something (the presence of drugs) that otherwise would have been unknowable without entering the apartment.[1]

Indeed, the fact that this was a search of a home distinguishes this case from dog sniffs in public places in *United States v. Place*, 462 U.S. 696, 698 (1983) (luggage at airport), and *Illinois v. Caballes*, 543 U.S. 405, 406 (2005) (traffic stop). Neither case implicated the Fourth Amendment's core concern of protecting the privacy of the home. It is true that Whitaker did not have a reasonable expectation of complete

---

[1] There is little doubt that a highly trained drug-detecting dog is a "super-sensitive instrument" under *Kyllo*. See *Jardines*, 133 S. Ct. at 1418-19 (Kagan, J., concurring). *Kyllo* described a category of "sense-enhancing technology" that is "not available to public use." 533 U.S. at 34. A trained dog's nose is a detection device capable of alerting the handler to the presence of odors at almost non-existent levels. Mark E. Smith, *Going to the Dogs: Evaluating the Proper Standard for Narcotic Detector Dog Searches of Private Residences*, 46 Hous. L. Rev. 103, 116-31 (2009). Like any technology, it is a tool that must be deployed in a particular way by a trained handler to be effective. *Id.* And like other sophisticated detection tools, the results and accuracy of dog searches are subject to detailed research and analysis. *Id.*

privacy in his apartment hallway. See *United States v. Concepcion*, 942 F.2d 1170, 1172 (7th Cir. 1991). Whitaker's lack of a reasonable expectation of complete privacy in the hallway does not also mean that he had no reasonable expectation of privacy against persons in the hallway snooping into his apartment using sensitive devices not available to the general public.

Whitaker's lack of a right to exclude did not mean he had no right to expect certain norms of behavior in his apartment hallway. Yes, other residents and their guests (and even their dogs) can pass through the hallway. They are not entitled, though, to set up chairs and have a party in the hallway right outside the door. Similarly, the fact that a police officer might lawfully walk by and hear loud voices from inside an apartment does not mean he could put a stethoscope to the door to listen to all that is happening inside. Applied to this case, this means that because other residents might bring their dogs through the hallway does not mean the police can park a sophisticated drug-sniffing dog outside an apartment door, at least without a warrant. See *Jardines*, 133 S. Ct. at 1416.

The practical effects of *Jardines* also weigh in favor of applying its holding to dog sniffs at doors in closed apartment hallways. Distinguishing *Jardines* based on the differences between the front porch of a stand-alone house and the closed hallways of an apartment building draws arbitrary lines.

First, there is the middle ground between traditional apartment buildings and single-family houses. How would courts treat a split-level duplex? Perhaps even one that had been converted from a house into apartments? Does the

number of units in the building matter, or do all multi-unit buildings lack the protection *Jardines* gives to single-family buildings? And what about garden apartments whose doors, like houses, open directly to the outdoors?

Second, a strict apartment versus single-family house distinction is troubling because it would apportion Fourth Amendment protections on grounds that correlate with income, race, and ethnicity. For example, according to the Census's American Housing Survey for 2013, 67.8% of households composed solely of whites live in one-unit detached houses. For households solely composed of blacks, that number dropped to 47.2%. And for Hispanic households, that number was 52.1%. The percentage of households that live in single-unit, detached houses consistently rises with income. At the low end, 40.9% of households that earned less than $10,000 lived in single-unit, detached houses, and, at the high end, 84% of households that earned more than $120,000 did so. See United States Census Bureau, American Housing Survey, *Table Creator*, http://sasweb.ssd.census.gov/ahs/ahstablecreator.html (allowing the breakdown of housing type by race and income).

The police engaged in a warrantless search within the meaning of the Fourth Amendment when they had a drug-sniffing dog come to the door of the apartment and search for the scent of illegal drugs.

*B. The Good-Faith Exception and* <u>Davis</u>

*Davis v. United States*, 131 S. Ct. 2419 (2011), held that evidence obtained in violation of the Fourth Amendment should not be suppressed, "when the police conduct a search in objectively reasonable reliance on binding appellate prec-

edent." 131 S. Ct. at 2434. This holding was based on the reasoning that officers should be permitted to rely on police practices specifically authorized by binding appellate precedent. *Id.* at 2439.

At the time of this search, there was no recognized expectation of privacy in the common areas of a multi-unit apartment building. See *United States v. Espinoza*, 256 F.3d 718, 723 (holding "tenants lack a legitimate expectation of privacy in the common areas of multi-family buildings"); *United States v. Concepcion*, 942 F.2d 1170, 1172 (7th Cir. 1991) (holding "tenant has no reasonable expectation of privacy in the common areas of an apartment building"); *Henry v. City of Chicago*, 702 F.3d 916 (7th Cir. 2012) ("Absent certain particular facts not alleged here, there is no reasonable expectation of privacy in common areas of multiple dwelling buildings."). However, no appellate decision specifically authorizes the use of a super-sensitive instrument, a drug-detecting dog, by the police outside an apartment door to investigate the inside of the apartment without a warrant. Therefore, the officer could not reasonably rely on binding appellate precedent, and the good-faith exception does not apply.

Moreover, *Kyllo* was decided before the search of Whitaker's apartment. The logic of *Kyllo* should have reasonably indicated by the time of this search that a warrantless dog sniff at an apartment door would ordinarily amount to an unreasonable search in violation of the Fourth Amendment.

### III. CONCLUSION

Accordingly, we REVERSE the denial of Whitaker's motion to suppress and REMAND for proceedings consistent with this opinion.