# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-2130
_____

United States of America

*Plaintiff - Appellee*

v.

Christopher Mateo Perez

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Eastern

_____

Submitted: February 18, 2022
Filed: August 18, 2022

_____

Before SMITH, Chief Judge, BENTON and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Christopher Perez appeals the denial of his motion to suppress, having preserved the right to do so pursuant to his conditional plea of guilty. He also appeals his sentence, challenging his classification as an armed career criminal pursuant to the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e), and in the alternative, the calculation of his Guidelines range on other grounds. We affirm the denial of the motion to suppress. We vacate his sentence and remand for resentencing,

however, because Perez does not have three prior qualifying convictions under the ACCA.

## I. Background

In summer 2019, Davenport Police Officer Seth Farley received information from a known confidential source that Perez had a pistol and was selling drugs, and that he was living with Brontianna Hare in Apartment 10 of a Davenport, Iowa, apartment building. Officer Farley confirmed Hare's address through a utilities check. He also knew that Perez had prior controlled substance convictions. Based on this information, Officer Farley requested a dog sniff of the apartment building. He did not seek a warrant, relying instead on an agreement between the Davenport Police Department and the apartment manager to allow police to enter the building to conduct dog sniffs in the hallways.

In the early morning of August 2, 2019, Officer Brandon Kopeke took his drug-sniffing dog, Dawn, to the apartment building, entered through an unlocked back door, and walked to the second floor. Dawn did not alert at any of the second-floor apartments. On the third floor, Dawn alerted to two apartments, numbers 10 and 12, about three to six inches from the bottom seams of the doors. Each apartment door is recessed from the main hallway in an alcove. Photos taken later show shoes and a doormat in the alcove area outside Apartment 10.

Officer Kopeke notified Officer Farley of the alert. Officer Farley then drafted an affidavit in support of a search warrant for Apartment 10. After a judge signed the warrant, Officer Farley surveilled the apartment building, saw Perez leave in a car, and followed him. When law enforcement tried to stop the car, Perez got out and led them on a brief foot chase, during which he dropped a bag of crack cocaine. Perez was taken into custody, and law enforcement executed the search warrant at Hare's apartment, finding crack cocaine, marijuana, drug paraphernalia, and a pistol. During questioning, Perez admitted to having a firearm.

On November 6, 2019, Perez was indicted on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Perez filed a motion to suppress evidence, arguing the dog sniff was an illegal search and evidence discovered through the search of his apartment and his admissions should therefore be excluded. The district court denied the motion.

On May 4, 2021, Perez entered a conditional guilty plea, preserving the right to challenge denial of the motion to suppress on appeal. In the plea agreement, the government agreed to recommend a 180-month sentence if Perez was determined to be an armed career criminal under the ACCA.

According to the presentence investigation report (PSR), Perez qualified for a sentencing enhancement under the ACCA, 18 U.S.C. § 924(e), based on three prior Iowa convictions for delivery of cocaine, and was therefore subject to a 15-year mandatory minimum sentence and application of United States Sentencing Guidelines § 4B1.4. His advisory Guidelines range was 188 to 235 months of imprisonment. Perez objected, asserting that he did not have three ACCA predicate offenses because the government could not establish that his Iowa cocaine offenses were committed on different occasions. Perez also objected to the Guidelines range calculation if the armed career criminal enhancement did not apply.

At sentencing, the government introduced the charging, plea, and judgment documents for Perez's Iowa cocaine convictions to establish they occurred on different occasions. Perez objected to reliance on these documents as improper and insufficient for the ACCA occasions analysis. The district court overruled all of Perez's objections to the PSR and sentenced him to 180 months of imprisonment and 3 years of supervised release. Perez timely appealed.

## II. Motion to Suppress

Perez argues the district court erred in denying his motion to suppress because the dog sniff violated his Fourth Amendment rights, either as a physical intrusion on

the curtilage of his home pursuant to <u>Florida v. Jardines</u>, 569 U.S. 1, 6–7 (2013), or as a violation of his reasonable expectation of privacy in the area immediately outside his apartment door. If the drug dog sniff was illegal, Perez argues, the officers otherwise lacked probable cause to search the apartment and the evidence should have been suppressed. The government argues, however, that even if the evidence was obtained pursuant to execution of an invalid search warrant, the district court properly denied Perez's motion to suppress under the <u>Leon</u> good faith exception. We agree.

Pursuant to the good faith exception, evidence is suppressed only if "(1) the affiant misl[ed] the issuing judge with a knowing or reckless false statement; (2) the issuing judge wholly abandoned her judicial role; (3) the supporting affidavit was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; or (4) the warrant was 'so facially deficient' that the executing officer could not reasonably presume its validity." <u>United States v. Notman</u>, 831 F.3d 1084, 1089 (8th Cir. 2016) (quoting <u>United States v. Leon</u>, 468 U.S. 897, 923 (1984)). When, as here, evidence is obtained through a Fourth Amendment violation, "the detectives' prewarrant conduct must have been 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.'" <u>United States v. Cannon</u>, 703 F.3d 407, 413 (8th Cir. 2013) (quoting <u>United States v. Conner</u>, 127 F.3d 663, 667 (8th Cir. 1997)). If, however, "the officers' prewarrant conduct is clearly illegal, the good-faith exception does not apply." <u>Id.</u> (quotation omitted). Whether law enforcement acted in objective good faith in executing a search based on a warrant or on controlling precedent is an issue we review do novo. <u>United States v. Cannon</u>, 703 F.3d 407, 411–12 (8th Cir. 2013).

Before the Supreme Court decided in <u>Jardines</u> that a drug dog sniff on the front porch of a house is an unlawful intrusion on the curtilage of a home, <u>see</u> 569 U.S. at 6–7, this court rejected a Fourth Amendment challenge to a drug dog sniff outside an interior apartment door in <u>United States v. Scott</u>, 610 F.3d 1009, 1016 (8th Cir. 2010). At the time Officer Farley requested, and Officer Kopeke

performed, the dog sniff outside Apartment 10, we had neither expressly overruled Scott nor explained how Jardines applies to apartment doors in a common hallway. See United States v. Hopkins, 824 F.3d 726, 732 & n.3 (8th Cir. 2016) ("In this case we need not consider how Jardines applies to interior hallways of an apartment complex."). Based on the state of our caselaw at the time of the search, we find that the good faith exception applies. It was reasonable for the officers to rely on our then-applicable precedent that dog sniffs at an interior apartment door are permissible. See Davis v. United States, 564 U.S. 229, 241 (2011) ("Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule."). We affirm the denial of Perez's motion to suppress.

## III. ACCA Predicate Offenses

Perez separately appeals his sentence. He asserts that he is not subject to the ACCA's 15-year mandatory minimum sentence because his three prior cocaine convictions under Iowa Code § 124.401(1)(c)(2) (2013) are not "serious drug offenses." See 18 U.S.C. § 924(e)(1). We ordinarily review de novo whether a prior conviction is an ACCA predicate offense. United States v. Humphrey, 759 F.3d 909, 911 (8th Cir. 2014). But because Perez did not object on this basis at sentencing, we review for plain error. See United States v. Price, 851 F.3d 824, 826 (8th Cir. 2017) (per curiam). Under plain error review, Perez must show: "(1) an error, (2) that is plain, and (3) that affects his substantial rights." United States v. Coleman, 961 F.3d 1024, 1027 (8th Cir. 2020) (citing United States v. Olano, 507 U.S. 725, 732 (1993)). We will exercise our discretion to correct such an error if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. (quotation omitted).

### A. Serious Drug Offense

To be subject to higher statutory penalties under the ACCA, an individual who violates 18 U.S.C. § 922(g) must have three or more prior convictions for offenses

that are "violent felon[ies]" or "serious drug offense[s]." 18 U.S.C. § 924(e)(1). As relevant here, a serious drug offense is defined as: "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law." Id. § 924(e)(2)(A)(ii).

To determine whether a prior conviction under state law qualifies as a serious drug offense, "we apply a categorical approach that looks to the statutory definition of the prior offense, not to the facts underlying a defendant's prior convictions." United States v. Oliver, 987 F.3d 794, 806 (8th Cir. 2021) (quoting United States v. Boleyn, 929 F.3d 932, 936 (8th Cir. 2019)). We focus solely on whether the elements of the prior state offense match the federal criteria for a "serious drug offense" under the ACCA. United States v. Vanoy, 957 F.3d 865, 867 (8th Cir. 2020) (citing Shular v. United States, 140 S. Ct. 779, 782 (2020)). "If the state offense sweeps more broadly, or punishes more conduct than the federal definition, the conviction does not qualify as a predicate offense." Id. Where a state statute is unambiguously broader than federal law, the categorical analysis ends with the text of the statutes. Gonzalez v. Wilkinson, 990 F.3d 654, 660–61 (8th Cir. 2021).

In 2013, Perez was convicted of three counts of delivery of a controlled substance—cocaine—in violation of Iowa Code § 124.401(1)(c)(2). These convictions are serious drug offenses under the ACCA if the definition of cocaine under Iowa law, Iowa Code § 124.206(2)(d), is a categorical match with the federal definition of cocaine as provided in the Controlled Substances Act (CSA), 21 U.S.C. § 812(c) Schedule II(a)(4). The first question is which versions of the state and federal definitions we should compare. The parties agree we should use the Iowa definition of cocaine at the time of Perez's state convictions in 2013. But Perez argues we should compare that to the definition in the federal drug schedule in effect at the time of his instant federal offense in 2019, while the government argues we should compare it to the federal definition in 2013.

-6-

We conclude that the relevant federal definition for ACCA purposes is the definition in effect at the time of the federal offense—for Perez, 2019. Whether a previous state conviction is a serious drug offense only becomes salient at the time of sentencing for a federal conviction under 18 U.S.C. § 922(g). Therefore, the federal law in effect at the time of the federal sentencing is the relevant definition for ACCA purposes. As the Eleventh Circuit recently explained, due process and fair notice considerations compel that a sentencing court consult the federal drug schedule in force at the time of the federal offense so that an actor has notice "not only that his conduct violated federal law, but also of his potential minimum and maximum penalty for his violation and whether his prior felony convictions could affect those penalties." United States v. Jackson, 36 F.4th 1294, 1300 (11th Cir. 2022). And as the Ninth Circuit observed, "it would be illogical to conclude that federal sentencing law attaches culpability and dangerousness to an act that, at the time of [federal] sentencing, Congress has concluded is *not* culpable and dangerous." United States v. Bautista, 989 F.3d 698, 703 (9th Cir. 2021) (quotation omitted). Applying now-superseded federal drug definitions would also undermine Congress's ability to revise federal criminal law as it deemed appropriate. See id.; see also United States v. Hope, 28 F.4th 487, 504–05 (4th Cir. 2022) (agreeing with the Ninth Circuit's analysis and rejecting the government's "contention that the status of a prior state conviction under the ACCA is determined by the federal law that applied at the time of that state conviction, not the time of federal sentencing" (cleaned up)).

McNeill v. United States, 563 U.S. 816 (2011), is not to the contrary. In McNeill, the Supreme Court analyzed "how a federal court should determine the maximum sentence for a prior state drug offense for ACCA purposes," specifically whether the district court should rely on a subsequent change in state law to determine whether a previous conviction was a serious drug offense under the ACCA. Id. at 817. The Court held the "ACCA requires a federal sentencing court to consult the maximum sentence applicable to a defendant's previous drug offense at the time of his conviction for that offense" because "[i]t cannot be correct that subsequent changes in state law can erase an earlier conviction for ACCA purposes."

Id. at 820, 823; see also United States v. Abdulaziz, 998 F.3d 519, 525 (1st Cir. 2021) ("McNeill expresses the principle that the elements of the state offense of conviction are locked in at the time of that conviction." (quoting United States v. Williams, 850 F. App'x 393, 399 (6th Cir. 2021) (unpublished))).

But the question presented here is different: Do we apply the version of the *federal* statute in force at the time of Perez's instant federal offense? In ordinary circumstances, the answer is an easy "yes." Yet the government advocates a view that would require the court, under these circumstances, to use a definition of cocaine that is no longer in effect. McNeill did not address this. See Bautista, 989 F.3d at 703 ("McNeill nowhere implies that the court must ignore current federal law and turn to a superseded version of the United States Code."); Hope, 28 F.4th at 505 (concluding that McNeill does not prohibit courts from considering changes to federal law for the purposes of the ACCA). And the reasoning in McNeill regarding state law does not translate to this issue concerning the federal drug statute. Contrary to the government's position that later changes in federal law would likewise "erase" prior state convictions for ACCA purposes, relying on current federal definitions effectuates Congress's intent to remove certain substances from classification as federal drug offenses. The government's insistence that we deviate from the usual rule of applying the federal law in force at the time of a federal offense is unavailing.

We also reject the government's argument that we rely on Doe v. Sessions, 886 F.3d 203 (2d Cir. 2018). In Doe, the Second Circuit held that when applying the categorical approach to state drug offenses in removal proceedings, "removability depends on whether a state drug schedule sweeps more broadly than the CSA Schedules in force at the time of the alien's conviction, and not at the time that his removal proceedings are initiated." Id. at 208. This rationale is specific to immigration law. In the removal context, if a noncitizen faces criminal charges, those charges may immediately subject the noncitizen to immigration consequences. See, e.g., Bautista, 989 F.3d at 704 (distinguishing categorical analysis in the immigration context based on "the policy importance of disclosure of the then-understood immigration consequences to defendants considering a guilty plea to the

state-law charge"); Abdulaziz, 998 F.3d at 531 (finding no similar concern in the serious drug offense given the "gap in time that necessarily exists" between a prior state conviction and federal consequence and the "highly contingent nature" of any consequence). In the context of the ACCA, in contrast, there is no risk of immediate federal consequences from a state law conviction. Consequences of a prior conviction for ACCA purposes only arise if the person later is convicted of a qualifying federal offense, so there is no need for certainty about possible consequences under federal criminal law at the time of a state conviction. Any future federal consequences are determined based on the federal law at the time of the federal offense that triggers those consequences. See Bautista, 989 F.3d at 704 ("[I]t is clear that the issue at sentencing is the nature of the prior state-law crime under federal law at the time of sentencing rather than at the time of the prior state-law conviction.").

We find that the categorical approach requires comparison of the state drug schedule at the time of the prior state offense to the federal schedule at the time of the federal offense.[1]

Turning to the statutes at issue in Perez's case, at the time of Perez's prior convictions, Iowa law defined cocaine as:

---

[1]This conclusion puts us in agreement with all other circuit courts of appeals to have addressed the question of whether, under the categorical approach, a prior state drug conviction should be compared to the current version of the CSA or the version in effect at the time of the prior state conviction. See, e.g., Abdulaziz, 998 F.3d at 525–27 (First Circuit); Hope, 28 F.4th at 504–05 (Fourth Circuit); Bautista, 989 F.3d at 703 (Ninth Circuit); Jackson, 36 F.4th at 1297, 1306 (Eleventh Circuit). The First Circuit in Abdulaziz and the Ninth Circuit in Bautista decided whether to compare the definitions of prior state drug offenses to the federal CSA at the time of the federal offense for Guidelines purposes, but we find their analyses of McNeill, 563 U.S. 816, and Doe, 886 F.3d 203, persuasive for the ACCA as well, because those courts apply the categorical approach using the CSA for Guidelines enhancements just as for ACCA mandatory minimum sentences.

Coca leaves and any salt, compound, derivative, or preparation of coca leaves. Decocainized coca leaves or extractions of coca leaves, which extractions do not contain cocaine or ecgonine, are excluded from this paragraph. The following substances and their salts, optical and geometric isomers, derivatives, and salts of derivatives and optical and geometric isomers, and any salt, compound, derivative, or preparation thereof that is chemically equivalent or identical to any of such substances, are included in this paragraph:

(1) Cocaine.

(2) Ecgonine.

Iowa Code § 124.206(2)(d) (2013). At the time of Perez's instant federal firearms offense, the federal drug schedules defined cocaine as:

(4) Coca leaves and any salt, compound, derivative or preparation of coca leaves (including cocaine and ecgonine and their salts, isomers, derivatives and salts of isomers and derivatives), and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, *except that the substances shall not include*:

(i) Decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine; or

(ii) Ioflupane.

21 C.F.R. § 1308.12(b)(4) (2018) (emphasis added). Because Perez's state statute of conviction included Ioflupane whereas the CSA specifically excludes Ioflupane as a controlled substance, the state statute is overbroad on its face, and our categorical analysis ends with the text of the statute. Gonzalez, 990 F.3d at 660–61. Perez's prior offenses are not serious drug offenses under the ACCA, and the district court erred by sentencing Perez as an armed career criminal.

## B. Plain Error

Under plain error review, three of the four elements are easily met. The district court erred as a matter of law, the error affects Perez's substantial rights by imposing a 15-year minimum sentence when a 10-year maximum sentence would otherwise apply, and this type of error affects the fairness of the judicial proceedings. Whether the error was plain is a closer question. An error is plain when a district court's decision is clearly contrary to law at the time of appeal. United States v. Pirani, 406 F.3d 543, 550 (8th Cir. 2005) (en banc) (quoting Johnson v. United States, 520 U.S. 461, 468 (1997)). At present, at least four of our sister circuits have addressed the same or a closely related question, all concluding that the categorical comparison is between the state law at the time of prior conviction and the federal law at the time of federal offense. This conclusion flows easily from the text and purpose of enhanced mandatory sentences under the ACCA, as well as from constitutional due process and fair notice concerns. These conditions are sufficient to conclude that the district court's decision, while not necessarily clearly contrary to law at the time of Perez's sentencing—before the current wave of circuit court decisions on this issue—is plainly contrary to the current state of the law, which is sufficient to reverse even under plain error review. See Johnson, 520 U.S. at 467 ("At a minimum, . . . the error must be plain under current law." (quotations omitted)). Accord Bautista, 989 F.3d at 705 (finding plain error where the district court erroneously compared the elements of a state law crime as they existed at the time of state conviction against the federal law at the time of the state law conviction rather than at the time of federal sentencing).

We remand for resentencing without the ACCA 15-year mandatory minimum sentence.[2]

---

[2]Perez also argues that the government failed to prove his prior convictions were committed on separate occasions. Because we find his prior convictions do not qualify as serious drug offenses, we do not reach this issue.

## IV. Guidelines Calculation

Perez raises additional issues with the district court's calculation of his Guidelines range absent the ACCA designation. We review the district court's interpretation and application of the Guidelines de novo, United States v. Barrientos, 670 F.3d 870, 873 (8th Cir. 2012), including whether a prior conviction qualifies as a controlled substance offense under the Guidelines, United States v. Williams, 926 F.3d 966, 969 (8th Cir. 2019).

### A. Controlled Substance Offenses[3]

Guidelines § 2K2.1(a)(3) imposes a base offense level of 22 if "(A) the offense involved a (i) semiautomatic firearm that is capable of accepting a large capacity magazine; or (ii) firearm that is described in 26 U.S.C. § 5845(a); and (B) the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense." The district court applied § 2K2.1(a)(3) because the firearm Perez possessed was a semiautomatic firearm capable of accepting a large capacity magazine and he had committed the instant offense after sustaining a prior conviction for a controlled substance offense. The question on appeal is whether Perez's Iowa cocaine convictions are indeed "controlled substance offenses" for purposes of the Guidelines.

> As used in § 2K2.1(a)(3), "controlled substance offense" is defined as:
> an offense under federal or state law, punishable by imprisonment for
> a term exceeding one year, that prohibits the manufacture, import,

---

[3]In addition to the procedural issues discussed herein, Perez also argues that his prior convictions do not qualify as controlled substance offenses because the Iowa statutes include inchoate offenses but the text of USSG § 4B1.2(b) does not. As recognized by both parties, this argument is foreclosed by United States v. Merritt, 934 F.3d 809, 811 (8th Cir. 2019) (stating that under the law of the circuit, "conspiracy to commit a controlled substance offense is itself a controlled substance offense as defined by the Guidelines").

export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

USSG § 4B1.2(b); USSG § 2K2.1, comment. (n.1). This circuit recently held in United States v. Henderson that the term "controlled substance" in § 4B1.2(b) is not limited to definitions in the CSA because there is no such limitation in the text of the definition at USSG § 4B1.2. See 11 F.4th 713, 718–19 (8th Cir. 2021). Rather, the court found that the plain meaning of the Guidelines generally includes "state-law offenses related to controlled or counterfeit substances punished by imprisonment for a term exceeding one year." Id. at 718 (quoting United States v. Ruth, 966 F.3d 642, 654 (7th Cir. 2020)). And this court has also held that whether a prior state conviction is a controlled substance offense for Guidelines purposes is based on the law at the time of conviction, without reference to current state law.[4] United States v. Bailey, 37 F.4th 467, 469–70 (8th Cir. 2022) (per curiam).

---

[4]Neither Henderson nor Bailey is inconsistent with the above analysis regarding the categorical approach under the ACCA for comparing state statutes of conviction with the federal CSA at the time of a federal offense. Where the ACCA imposes a higher mandatory minimum sentence for a *federal* firearms offense based on whether the defendant has previously committed a "serious drug offense" as defined under the *federal* Controlled Substances Act, the Guidelines provide guidance for sentencing based on a defendant's criminal history, risk of recidivism, and other relevant characteristics, including whether any prior state law offenses were related to controlled or counterfeit substances under state law. Further, while McNeill does not apply to the ACCA analysis in this case for the reasons stated above, under the Guidelines as interpreted by this court in Henderson and Bailey the focus is solely on Perez's prior state law offenses, which McNeill requires be considered only in light of then-applicable state law. See, e.g., United States v. Hope, 28 F.4th 487, 505 (4th Cir. 2022) (contrasting the situation in which a change in state law is at issue from when a change in federal law is at issue). Indeed, the Fourth Circuit also recently held that the ACCA categorial approach requires comparison of state law from the time of prior conviction with the CSA at the time of offense, see id., despite also having decided that a controlled substance offense

These decisions control the result here. Perez's uncontested prior cocaine convictions are controlled substance offenses under Iowa law for purposes of calculating his advisory Guidelines range, irrespective of later changes in the definition of "cocaine" under Iowa state law or federal law.

## B. Criminal History Points

Lastly, Perez argues that no criminal history point should be assigned to his prior Illinois conviction for misdemeanor fleeing or attempting to elude a peace officer under 625 Ill. Comp. Stat. 5/11-204(a), for which he was sentenced to pay a $245 fine. Without the ACCA enhancement, the one point assigned to this offense increased Perez's criminal history category from III to IV.

United States Sentencing Guidelines § 4A1.2(c)(1) instructs that criminal history points are calculated based on "all felony offenses" and on misdemeanors and petty offenses, unless the misdemeanor is listed in § 4A1.2(c)(1) or is an offense "similar to" a listed offense, including "hindering or failure to obey a police officer" and "resisting arrest." First, Perez asserts that his misdemeanor conviction under 625 Ill. Comp. Stat. 5/11-204(a) is a listed offense because it is "hindering or failure to obey a police officer."

Perez's statute of conviction reads:

> Any driver or operator of a motor vehicle who, having been given a visual or audible signal by a peace officer directing such driver or operator to bring his vehicle to a stop, *willfully fails or refuses to obey such direction*, increases his speed, extinguishes his lights, or otherwise flees or attempts to elude the officer, is guilty of a Class A misdemeanor.

---

for Guidelines purposes depends only on the relevant state law of conviction, see United States v. Ward, 972 F.3d 364, 372 (4th Cir. 2020).

625 Ill. Comp. Stat. § 5/11-204(a) (2013) (emphasis added). Though the offense includes an aspect of failing or refusing to obey the direction of a peace officer, we find that it is not a listed offense. It is not exactly "hindering or failure to obey a police officer," because the Illinois statute has the added requirement that the person be a "driver or operator of a motor vehicle." And Illinois law contains a separate offense that encompasses resisting arrest, codified in a different chapter at 720 Ill. Comp. Stat. 5/31-1(a) (2012) ("Resisting or obstructing a peace officer"): "a person who knowingly resists or obstructs the performance by one known to the person to be a peace officer, . . . of any authorized act within his or her official capacity commits a Class A misdemeanor."

Perez argues in the alternative that, even if fleeing is not a listed offense, it is "similar to" a misdemeanor for "hindering or failure to obey a police officer" and "resisting arrest," and therefore should not have been counted in his criminal history score. To determine whether an unlisted offense is similar to an offense listed in § 4A1.2(c)(1), the Guidelines applications notes indicate:

> the court should use a common sense approach that includes consideration of relevant factors such as (i) a comparison of punishments imposed for the listed and unlisted offenses; (ii) the perceived seriousness of the offense as indicated by the level of punishment; (iii) the elements of the offense; (iv) the level of culpability involved; and (v) the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct.

USSG § 4A1.2, comment. (n.12(A)). The government concedes that the first two factors weigh in favor of finding that fleeing under Illinois law is similar to resisting arrest and hindering or failure to obey a police officer. Both are Class A misdemeanors and the seriousness of the offense—as indicated by the level of punishment—is equivalent. As to the third factor, the government points out that under the Illinois statute at issue, fleeing includes as an element that the defendant be the "driver or operator of a motor vehicle." Resisting arrest and hindering or

-15-

failure to obey a police officer under 720 Ill. Comp. Stat. 5/31-1(a), in contrast, do not require the operation of a motor vehicle.

Under a common-sense approach, we conclude that fleeing a peace officer under 625 Ill. Comp. Stat. 5/11-204(a) is materially dissimilar from resisting arrest and hindering or failure to obey a police officer under Illinois law. Fleeing a peace officer requires operation of a motor vehicle, which increases the danger posed to the public by the offense. See United States v. Mendez-Lopez, 338 F.3d 1153, 1160–61 (10th Cir. 2003) ("Committing an offense while in a motor vehicle inherently increases the potential threat to public safety."). The offense of fleeing a peace officer is also found in a different chapter of the Illinois Statutes than is resisting arrest; the former is under the "Vehicles" chapter, while the latter is an "offense affecting governmental functions." See United States v. Ruacho, 746 F.3d 850, 854 (8th Cir. 2014) (per curiam) (applying the test from USSG § 4A1.2 comment. (n.12) and concluding the offenses were dissimilar, a result supported in part by the fact that they were "found in separate chapters of the Minnesota Statutes"). Assigning one criminal history point to Perez's conviction for fleeing a peace officer under Illinois law was not error.

## V. Conclusion

We affirm the denial of Perez's motion to suppress, but we vacate his sentence and remand to the district court for resentencing consistent with this opinion.

KELLY, Circuit Judge, concurring.

I agree that the motion to suppress was properly denied under the good faith exception, but I would find that the drug dog sniff of Apartment 10 was a violation of Perez's Fourth Amendment rights.[5]

Curtilage is the area "immediately surrounding and associated with the home" and is considered "part of the home itself for Fourth Amendment purposes." Florida v. Jardines, 569 U.S. 1, 6 (quoting Oliver v. United States, 466 U.S. 170, 180 (1984)). "[W]hether a particular area is part of the curtilage of an individual's residence requires consideration of factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." United States v. Hopkins, 824 F.3d 726, 731 (8th Cir. 2016) (quoting United States v. Bausby, 720 F.3d 652, 656 (8th Cir. 2013)). This court analyzes four factors to determine if an area is curtilage (the "Dunn factors"): (1) the proximity to the home of the area claimed to be curtilage, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put,

_____

[5]Before reaching the good faith exception, I would also examine the sufficiency of the warrant affidavit without the information from the unlawful search. United States v. Hernandez Leon, 379 F.3d 1024, 1027 (8th Cir. 2004). "Probable cause exists, if under the totality of the circumstances, a showing of facts can be made sufficient to create a fair probability that evidence of a crime will be found in the place to be searched." United States v. Johnson, 848 F.3d 872, 876 (8th Cir. 2017). Here, the drug dog alert was the only evidence in the warrant affidavit linking the suspected contraband to the place to be searched. Officer Farley did not corroborate that Perez was living in Apartment 10—only that Hare's name was on the unit's utilities. And the informant did not say that Perez was selling drugs out of Apartment 10 or that the pistol or any drugs were stored in the apartment. Officer Farley offered a generalized opinion that a person who possesses or sells controlled substances "frequently maintain records, controlled substances, [and] proceeds . . . in their residence(s)," but this is insufficient to establish the requisite nexus between the specific evidence sought—drugs and a gun associated with Perez—and the precise location to be searched—Apartment 10. Without the evidence obtained from the dog sniff, the warrant in this case was not supported by probable cause.

and (4) the steps taken by the resident to protect the area from observation by people passing by. Bausby, 720 F.3d at 656 (quoting United States v. Dunn, 480 U.S. 294, 301 (1987)). The factors "are not mechanically applied and are considered together." Hopkins, 824 F.3d at 731.

Although we have not considered, in light of Jardines, whether the area around an apartment door that opens into an interior common hallway may be curtilage based on the Dunn factors, see Hopkins, 824 F.3d at 732 n.3 ("In this case we need not consider how Jardines applies to interior hallways of an apartment complex."), we have twice examined whether there is curtilage around the entrance to an exterior-facing apartment. See Hopkins, 824 F.3d at 731–33; United States v. Burston, 806 F.3d 1123, 1126–28 (8th Cir. 2015). The reasoning from these cases instructs my analysis here.

The first factor, proximity of the area to the home, weighs strongly in favor of finding that the search occurred within the curtilage. Dawn sniffed and alerted within three to six inches from the bottom seam of the door to Apartment 10. See Hopkins, 824 F.3d at 732 ("Officer Fear testified that Marco was trained 'to get as close to the source as possible' and that he was within 'six to eight inches' of the door when he alerted and 'actually sniffed the creases of the door.' That proximity strongly supports a finding of curtilage."); Burston, 806 F.3d at 1127 ("[T]he area sniffed was in close proximity to Burston's apartment—six to ten inches. That area is 'immediately surrounding' his residence."); see also Jardines, 569 U.S. at 4 (noting the dog sniffed the base of the front door).

The second factor, whether the area searched was within an enclosure surrounding the home, does not translate as easily from the context of a single-family home to an interior-facing apartment in a multi-family building. There was an alcove around the apartment door, but the apartment was not otherwise enclosed or separated from the rest of the hallway. This factor likely weighs against a finding of curtilage, but it is not dispositive. Indeed, there was no enclosure around the exterior apartment doors or windows in either Hopkins or Burston, yet those areas

were found to be curtilage. Nor was the front porch enclosed in Jardines. See, e.g., Hopkins, 824 F.3d at 732 ("The second and fourth Dunn factors weigh against a finding of curtilage in this area because the front of the door was not enclosed by a fence or wall and was not protected from observation by visitors (though neither was the front porch in Jardines, see 133 S. Ct. at 1413).").

Third, the record indicates that the area in front of each apartment door was for that tenant's personal use, with photos showing a floor mat and at least two pair of shoes in front of Apartment 10. The government takes a broader view, emphasizing that the common hallway is open to all tenants and visitors. But it is not the use of the hallway generally that is at issue. It is the use of the area in question: the area immediately surrounding the door to Apartment 10, recessed from the common hallway, where the search occurred.

In Hopkins, this court noted that "[e]ven [the defendant's] neighbor would not pass within 6 to 8 inches of Hopkins' door when going to his own." 824 F.3d at 732. The same is true of the door to Apartment 10. The court further noted that there was no "'common hallway' which all residents or guests must use to reach their units." Id. And while there is a common hallway here, the search did not take place in the portion of the hallway that "all residents or guests must use to reach their units." The area where the search took place was mere inches in front of a door that is set back from the main area of the hallway. Under the same rationale applied in Hopkins, there is no reason a neighbor or a guest of the building "must" be as close to the door of Apartment 10 as the dog was when performing the drug search. Rather, "[t]he area within a foot of the only door to the [apartment] would be used every day by its residents as they came and went." Id. The threshold of an apartment door is for the personal use of each tenant, and the third Dunn factor weighs in favor of finding it is curtilage.

Lastly, it does not appear that Perez or Hare took any steps to protect the area around the apartment door from observation (though it is unclear whether they could), making the fourth Dunn factor weigh against concluding the area is the

-19-

curtilage. Like the second factor, the fourth factor was found lacking in <u>Hopkins</u>, too, but that did not preclude us from finding the area to be curtilage. <u>See</u> 824 F.3d at 732.

In sum, the first and third <u>Dunn</u> factors weigh in favor of the area searched— several inches from the seam of the apartment door—being curtilage, while the second and fourth weigh against. Treating the apartment in this case the same as the apartments in <u>Hopkins</u> and <u>Burston</u>, the area searched was curtilage based on the <u>Dunn</u> factors.

The question remains, however, whether there is something peculiar about an interior apartment door, as compared to an outward-facing apartment door, that alters the result. Curtilage has been defined as "the area 'immediately surrounding and associated with the *home*'" and is "part of the *home* itself for Fourth Amendment purposes," <u>Jardines</u>, 569 U.S. at 6 (emphasis added) (quoting <u>Oliver</u>, 466 U.S. at 180), and many people call an apartment home. <u>See</u> <u>United States v. Whitaker</u>, 820 F.3d 849, 854 (7th Cir. 2016) ("Distinguishing <u>Jardines</u> based on the differences between the front porch of a stand-alone house and the closed hallways of an apartment building draws arbitrary lines."). Though Perez could not plant a bush in front of his apartment door nor place a grill outside it, <u>see</u> <u>Burston</u>, 806 F.3d at 1125, the notion of curtilage—the area immediately surrounding the home—cannot be dependent on factors that can exist only when an apartment unit has an outside facing entrance.

Further, that a common hallway in an apartment building may not constitute curtilage in its entirety does not render the <u>Dunn</u> factors inapplicable either. Courts routinely make determinations about how far curtilage extends. <u>See</u> <u>Jardines</u>, 569 U.S. at 7 (noting that, "[w]hile the boundaries of the curtilage are generally clearly marked, the conception defining the curtilage is at any rate familiar enough that it is easily understood from our daily experience." (quotation omitted)). In <u>Hopkins</u>, a walkway jutted off from a sidewalk in a courtyard and led to a concrete slab in front of two outdoor-facing apartment doors about one foot apart. 824 F.3d at 729. Both

the sidewalk and walkway were for shared use, at minimum by the tenants of the two adjacent apartments, and this court concluded that the commonly used sidewalk was not curtilage. But the area immediately in front of Hopkins's apartment door, which was "'common' only to Hopkins and his immediate neighbor," was. See id. at 732. In my view, the same reasoning applies here: there is a meaningful distinction between a common hallway and the area inches from the bottom seam of an individual apartment door. The hallway in Perez's apartment building is commonly used space, but the area immediately in front of the door is so closely associated with his individual residence that it can be considered part of the home. Cf. Whitaker, 820 F.3d at 854 (discussing different types of apartment buildings and suggesting that distinguishing between them would be arbitrary).

In light of Jardines and our post-Jardines cases, there is a meaningful distinction between the common hallway and the area immediately surrounding the apartment door where the search occurred in this case, and I would conclude that the dog sniff was an unlicensed physical intrusion on the curtilage of Apartment 10.

_____