In the

# United States Court of Appeals

## For the Seventh Circuit

No. 23-2224

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JUVENTINO L. PLANCARTE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 22-cr-00064 — **William M. Conley**, *Judge.*

ARGUED MAY 20, 2024 — DECIDED JUNE 28, 2024

Before FLAUM, BRENNAN, and KOLAR, *Circuit Judges.*

FLAUM, *Circuit Judge.* During a traffic stop, Wisconsin police officers used a K-9 unit to sniff a car they suspected was involved in drug trafficking. The dog returned a positive alert, so the officers searched the car and found almost eleven pounds of methamphetamine in its trunk. On appeal, defendant Juventino Plancarte, who was inside the car during the stop, challenges the district court's denial of his motion to suppress. We affirm.

## I.   Background

### A.  Factual Background

On the evening of January 20, 2022, Officer James Mancuso was conducting surveillance in La Crosse, Wisconsin, when a state trooper notified him of a vehicle of interest heading in his direction. Soon after, Mancuso saw a car matching the trooper's description and tailed it for several hours. As he followed the car, he observed the vehicle exhibiting behavior consistent with drug trafficking activity.

Mancuso also noticed that the car had unlawful window tints, so he directed two other officers to perform a traffic stop. During the stop, Officer Aaron Westpfahl and his K-9 partner Loki arrived on the scene. Loki conducted a sniff and alerted to drugs in the car. The officers then searched the car and discovered a backpack containing "a large amount of a crystal-like substance" in its trunk. They arrested the car's occupants, including Plancarte. Lab testing later revealed that the substance in the backpack was 10.96 pounds of methamphetamine.

### B.  Procedural Background

A grand jury indicted Plancarte on two counts related to methamphetamine distribution. He moved to suppress the evidence obtained after Loki's sniff. According to Plancarte, Loki can identify both illegal marijuana products and legal products that come from cannabis plants. Since Loki could theoretically alert officers to legal cannabis products, Plancarte argues that the sniff violated the Fourth Amendment because it was a warrantless search unsupported by probable cause.

A magistrate judge held an evidentiary hearing before ruling on Plancarte's motion. At the hearing, Westpfahl testified that Loki was trained to identify several illegal drugs, including marijuana and methamphetamine, based on their scent. If Loki smelled one of those drugs during a sniff, he would exhibit a behavioral signal indicating a "positive alert." Westpfahl also explained that Loki's positive alerts have never uncovered physical evidence of legal cannabis products. Even so, an expert witness testified that dogs cannot tell the difference between illegal marijuana and legal cannabis products based on smell.

Westpfahl also presented data to illustrate Loki's accuracy during sniffs. The data showed that, when officers searched a vehicle after Loki returned a positive alert, they discovered contraband about 80% of the time. If the ensuing search did not reveal contraband, Westpfahl would later ask the vehicle's owner or occupants if any contraband had recently been in the car. In response to that inquiry, over half of respondents confirmed that contraband had recently been in the sniffed vehicle. On one occasion, after Loki returned what appeared to be a false positive during a car sniff, the vehicle's owner told Westpfahl that he frequently smoked legal cannabis products in the car. There is no evidence, however, corroborating that the cannabis product in that inquiry was legal.

Following the evidentiary hearing, the magistrate judge issued a report and recommendation denying Plancarte's suppression motion. The district court adopted those recommendations, and Plancarte later pleaded guilty to both drug charges. Plancarte received concurrent 180-month sentences,

and he now appeals the district court's denial of his motion to suppress.[1]

## II.     Discussion

"In considering a district court's denial of a motion to suppress, we review questions of law de novo and findings of fact for clear error." *United States v. Beechler*, 68 F.4th 358, 364 (7th Cir. 2023).

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (alteration in original) (quoting U.S. Const. Amend. IV). As its plain text indicates, "the Fourth Amendment is triggered only by a search or seizure." *Hess v. Garcia*, 72 F.4th 753, 764 (7th Cir. 2023).

"Two lines of precedent govern whether officer conduct amounts to a search." *United States v. Lewis*, 38 F.4th 527, 533 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 2499 (2023). The first is called the "property-based approach," which applies when "an officer enters a constitutionally protected area, such as the home, for the purpose of gathering evidence against the property owner." *Id.* The second is called the "privacy-based approach." *Id.* at 534. Under that approach, we consider whether government action invaded a person's actual, subjective expectation of privacy that society recognizes as reasonable. *Id.* at 535 (7th Cir. 2022) (discussing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)); *see also United States*

---

[1] Plancarte, in his opening brief, argued that he is eligible for safety valve relief. His reply brief concedes that *Pulsifer v. United States*, 601 U.S. 124, 127–28 (2024), forecloses that argument.

*v. Wood*, 16 F.4th 529, 534 (7th Cir. 2021) (explaining that "the ultimate touchstone of the Fourth Amendment is reasonableness" when determining what constitutes a search (citation and internal quotation marks omitted)).

Plancarte does not suggest—and rightly so—that the area around a car on a public road is a "constitutionally protected area." *Lewis*, 38 F.4th at 533. As a result, we instead focus on the privacy-based approach.

However, "canine inspection of an automobile during a lawful traffic stop[] do[es] not violate the 'reasonable expectation of privacy' described in *Katz*." *Florida v. Jardines*, 569 U.S. 1, 10 (2013) (discussing *Illinois v. Caballes*, 543 U.S. 405, 409–10 (2005)). Rather, when "performed on the exterior of [a] car" during a "lawful[] seiz[ure] for a traffic violation," dog sniffs "generally do[] not implicate legitimate privacy interests." *Caballes*, 543 U.S. at 409. "A 'canine sniff' by a well-trained [drug] detection dog," therefore, "d[oes] not constitute a 'search' within the meaning of the Fourth Amendment." *United States v. Place*, 462 U.S. 696, 707 (1983); *see also Caballes*, 543 U.S. at 410.

Two related principles underscore this conclusion. First, dog sniffs on the exterior of an automobile during a traffic stop are "not designed to disclose any information other than the presence or absence of narcotics." *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000). Second, they are "generally likely … to reveal only the presence of contraband." *Caballes*, 543 U.S. at 409. Together, these concepts illustrate that "the manner in which information is obtained" during a sniff is "much less intrusive than a typical search" and results in only a "limited disclosure," which protects against the property

owner's "embarrassment and inconvenience." *Place*, 462 U.S. at 707.

Despite this precedent, which affirms the constitutionality of K-9 sniffs in public places, Plancarte nevertheless argues that the legalization of some cannabis products changed the Fourth Amendment landscape for dog sniffs. He contends that K-9s like Loki cannot distinguish between illegal marijuana and other, legal cannabis products, so drug sniffs reveal more than just contraband. According to Plancarte, that undercuts the holdings of *Place* and *Caballes*, which emphasized that dog sniffs are unique—and not searches—because they alert only to illegal items. *Caballes*, 543 U.S. at 409; *Place*, 462 U.S. at 707.

He instead points to *Kyllo v. United States*, a case in which the Supreme Court limited the warrantless use of thermal imaging technology to observe activity inside a home. 533 U.S. 27, 40–41 (2001). There, the Court explained that "the Government['s] use[] [of] a device that is not in general public use[] to explore details of the home that would previously have been unknowable without physical intrusion … is a 'search' and is presumptively unreasonable without a warrant." *Id.* at 40. Plancarte urges us to apply *Kyllo* here because drug detection dogs, like thermal imaging technology, are "super-sensitive instrument[s]," unavailable to the general public and capable of revealing "details … that would … be[] unknowable without physical intrusion." *United States v. Whitaker*, 820 F.3d 849, 853 & n.1 (7th Cir. 2016).

But there is a problem with extending *Kyllo* to these facts: Loki's sniff occurred outside the home. It is well established that the home is "[a]t the very core of the Fourth Amendment," *Kyllo*, 533 U.S. at 31 (citations and internal quotation

marks omitted), and "first among equals," *Jardines*, 569 U.S. at 6. "The expectation of privacy with respect to one's automobile" or in a public space is therefore "significantly less than that relating to one's home." *United States v. Lozano*, 171 F.3d 1129, 1131 (7th Cir. 1999) (quoting *United States v. Velarde*, 903 F.2d 1163, 1166 (7th Cir. 1990)).

Our dog sniff jurisprudence itself sets apart dog sniffs occurring in public areas from those that involve homes or other private places. *Whitaker*, 820 F.3d at 853 (distinguishing Fourth Amendment concerns attendant to using drug-sniffing dogs on homes compared to sniffs performed in public places). So, while using "trained police dogs to investigate the home … is a 'search' within the meaning of the Fourth Amendment," *Jardines*, 569 U.S. at 11–12, dog sniffs conducted in public places are generally not, *Caballes*, 543 U.S. at 409. Just as is the case here, the sniffs in both *Place* and *Caballes* occurred in public areas, and "[n]either implicated the Fourth Amendment's core concern of protecting the privacy of the home." *Whitaker*, 820 F.3d at 853. Since *Kyllo*'s holding also cannot be divorced from that context, we decline to extend it to these facts. *See* 533 U.S. at 40 (explaining that "the Fourth Amendment draws a firm line at the entrance to the house" (citation and internal quotation marks omitted)).

Another problem remains for Plancarte: Courts have long acknowledged and tolerated the imperfection of drug detection dogs. For example, in *United States v. Bentley*, we concluded that a dog sniff supported probable cause despite the dog's 59.5% accuracy rate. 795 F.3d 630, 636–37 (7th Cir. 2015); *see also Caballes*, 543 U.S. at 409 (recognizing that, even "if properly conducted," dog sniffs are merely "generally likely[] to reveal only the presence of contraband"); *United States v.*

*Perez*, 29 F.4th 975, 986–87 (8th Cir. 2022) (discussing instances in which drug-sniffing dogs had been deemed reliable despite accuracy rates under 60%); *United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997) (stating that a search following a positive alert by a dog with at least a 71% accuracy rate satisfied probable cause); *Whitaker*, 820 F.3d at 853 n.1 (explaining that "the results and accuracy of dog searches are subject to detailed research and analysis"). *But see Caballes*, 543 U.S. at 410 (Souter, J., dissenting) (describing dog sniff jurisprudence as resting on the "untenable … assumption that trained sniffing dogs do not err"). While *Bentley* occurred in the probable cause context, that error rate is much higher than what can be attributed to Loki. And as for Loki, "a very low percentage of false positives is not necessarily fatal to a finding that a drug detection dog is properly trained and certified." *United States v. Diaz*, 25 F.3d 392, 396 (6th Cir. 1994).

Even if drug sniffing dogs struggle to differentiate between illegal marijuana and other legal cannabis products, Loki does not. On the contrary, at the time of the suppression hearing, Loki had returned 215 positive alerts from a total of 328 sniffs during his career. Of those 215 positive alerts, Loki's sniffs led to the discovery of physical evidence of contraband around 80% of the time. Furthermore, in more than half of "false positive" cases, officers later learned that drugs had recently been inside the vehicle, further decreasing Loki's "false positive" rate.

At most, Loki may have—on a single occasion—returned a false positive where the car's operator later admitted that he routinely smoked legal cannabis products in the vehicle. Even looking beyond the fact that officers did not recover cannabis products of any kind from that operator's vehicle and were

otherwise unable to confirm whether the cannabis product in question was, in fact, legal, that lone instance does not mean Loki is not "well-trained." This rings especially true because physical evidence of legal cannabis products has never been discovered after any of Loki's positive alerts. Instead, that single instance resembles a false positive alert, and we have never held that a low rate of false positive alerts converts an otherwise permissible dog sniff into a search.

Loki, a reliable drug detection dog, conducted an open-air sniff on a public road during an ordinary traffic stop. *Place* and *Caballes* confirm that a sniff performed in this manner is not a Fourth Amendment search because it does not disrupt any reasonable expectation of privacy. For that reason, the district court appropriately denied Plancarte's motion to suppress.

### III.    Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of Plancarte's motion to suppress.